UNITED STATES of America, Appellee,

v.

Jorge BUENAVENTURA–ARIZA and Delores Quiroz-Santi, Appellants.

Nos. 194, 195, Dockets 79–1211, 79–1213.

United States Court of Appeals, Second Circuit.

Argued Sept. 18, 1979.

Decided Jan. 3, 1980.

---

George Sheinberg, Brooklyn, N. Y., for appellant Buenaventura-Ariza.

Domenick J. Porco, New York City (Barry Asness, and Diller, Schmukler & Asness, New York City, on the brief), for appellant Quiroz-Santi.

Thomas G. Roth, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., and Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Before FEINBERG, MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Jorge Buenaventura-Ariza (Buenaventura) and Delores Quiroz-Santi (Quiroz) appeal from judgments of conviction entered on guilty pleas in the Eastern District of New York, Henry Bramwell, *District Judge*, following denial of their motions to suppress physical evidence seized from them by federal narcotics agents during a warrantless airport stop and search of appellants. Appellants pled guilty to one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1976). They preserved the right to appeal from the denial of their suppression motions pursuant to a court-approved agreement.[1] The propriety of the order denying their suppression motions is the sole issue on appeal.

In the recent past, we have addressed on numerous occasions the legality of warrantless "investigatory stops" of deplaning airline passengers by agents of the Drug Enforcement Administration (DEA). *E.g., United States v. Vasquez,* 612 F.2d 1338

---

1. *United States v. Vasquez-Santiago,* 602 F.2d 1069, 1070 n.2 (2 Cir. 1979); *United States v. Price,* 599 F.2d 494, 496 n.1 (2 Cir. 1979).

(2 Cir. 1979); *United States v. Vasquez-Santiago,* 602 F.2d 1069 (2 Cir. 1979); *United States v. Price,* 599 F.2d 494 (2 Cir. 1979); *United States v. Rico,* 594 F.2d 320 (2 Cir. 1979); *United States v. Oates,* 560 F.2d 45 (2 Cir. 1977).[2] In each of these cases, we have affirmed the constitutionality of the investigatory stops,[3] concluding that the "specific and articulable" facts upon which the seizures were based justified a "reasonable suspicion" that the individuals were engaged in criminal narcotics trafficking.

The fact that the DEA has received approval of its airport seizures in prior cases before this Court, however, does not compel a similar result here. Each case of course must be judged on its own facts. We must examine carefully the facts of the particular case to assure ourselves that the Constitution has not been violated. The standard of reasonable suspicion required to justify detention short of arrest may well be "rather lenient", but it is not non-existent. Of necessity there must be a line separating investigatory stops supported by "specific, objective facts" from those stops occurring essentially at the "unfettered discretion of officers in the field." *Brown v. Texas,* 443 U.S. 47, 51 (1979). We hold that that line has been crossed by the federal narcotics agents in this case. We therefore vacate the judgments of conviction and remand for further proceedings.

## I.

The relevant facts here are simple and straightforward.

At approximately 11:15 a.m. on February 23, 1979, DEA Agent Gerard Whitmore[4] was stationed at LaGuardia Airport. He was observing passengers as they deplaned from flights arriving from so-called drug "source cities".[5] One such flight was National Airlines Flight 138 from Miami.

After about twenty-five to thirty passengers had disembarked from Flight 138, appellants Buenaventura and Quiroz left the plane and entered the lounge area of the airport. The two were conversing as they left the plane, but they separated when they entered the terminal. Quiroz walked briskly toward the escalator leading down to the baggage area. Buenaventura followed about fifteen to twenty paces behind. Agent Whitmore testified that Buenaventura looked as though he was trying to keep Quiroz in view as he trailed behind her. Buenaventura also glanced about him as he walked through the terminal. Upon reaching the escalator, Quiroz paused before stepping on it. When Buenaventura reached the escalator, he paused to allow several passengers to pass him before he stepped on the escalator himself.

2. Airport investigatory stops by drug enforcement agents have been the subject of numerous cases in other circuits as well. *E.g., United States v. Mendenhall,* 596 F.2d 706 (6 Cir. 1979) (en banc), *cert. granted,* 48 U.S.L.W. 3185 (U.S. Oct. 2, 1979); *United States v. Smith,* 574 F.2d 882 (6 Cir. 1978); *United States v. McCaleb,* 552 F.2d 717 (6 Cir. 1977); *United States v. Roundtree,* 596 F.2d 672 (5 Cir. 1979); *United States v. Elmore,* 595 F.2d 1036 (5 Cir. 1979); *United States v. Ballard,* 573 F.2d 913 (5 Cir. 1978); *United States v. Chatman,* 573 F.2d 565 (9 Cir. 1977); *United States v. Scott,* 545 F.2d 38 (8 Cir. 1976), *cert. denied,* 429 U.S. 1066 (1977).

3. An "investigatory stop" ordinarily occurs when federal narcotics agents approach the individual, identify themselves, and ask the suspect to produce identification or explain his actions.

4. Agent Whitmore was working with two other agents at the time. Whitmore has monitored domestic flights as part of the DEA program since 1976. He also took part in the investigatory stops reviewed by our Court in *Rico, Price, Vasquez-Santiago,* and *Vasquez, supra.*

5. A "source city" is a city from which drugs are shipped to other points for sale or further distribution. In this case, the source city was Miami. Source cities in other cases have included Chicago (*e. g., United States v. Price, supra*), Detroit (*e. g., United States v. Elmore, supra*), and Los Angeles (*e. g., United States v. Andrews,* 600 F.2d 563 (6 Cir. 1979)). Thousands of passengers travel from "source cities" every day. As the court in *Andrews* observed, "our experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center." *Id.* at 566–67.

After reaching the bottom of the escalator, Quiroz walked straight to the baggage claim area where she had to wait about ten minutes for her bags to arrive. Agent Whitmore perceived her to be nervous and frustrated as she waited for the baggage. Meanwhile, Buenaventura remained outside the baggage claim area, "mill[ing] about".

After her luggage arrived, Quiroz proceeded to a taxi stand outside the terminal. Buenaventura followed Quiroz, joined her in the taxi line, and began conversing with her again. At this point the agents made the investigatory stop.[6]

## II.

Before evaluating the specific facts of this case, we believe that it may be helpful briefly to review several Supreme Court decisions which provide a framework for analyzing an airport investigatory stop. Our review begins with *Terry v. Ohio*, 392 U.S. 1 (1968). The Court in *Terry* held that a law enforcement officer has the power to detain a person temporarily for the purpose of interrogating him even if the officer does not have "probable cause" to make a complete arrest. If the officer reasonably suspects that the detainee has committed or is about to commit a crime, then the officer may make an investigatory stop. *Id.* at 20–24. In *Terry* a police officer stopped three men whom he had observed "casing" a downtown Cleveland store. Two of the men had walked back and forth some twenty-four times along an identical route in front of the store, pausing each time to stare in the same store window. The Court

upheld the constitutionality of the stop and subsequent frisk, since the officer had been "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21 (footnote omitted).

While *Terry* established that the objective standard required to justify an investigatory stop is less than probable cause—indeed, the standard has been characterized as "rather lenient"[7]—the standard nevertheless is more than a mere paper tiger. In two recent cases, the Supreme Court has made it clear that the standard does have teeth.

*Delaware v. Prouse*, 440 U.S. 648 (1979), dealt with the grounds upon which police officers may make investigatory stops of automobiles. The Court held that persons traveling in automobiles have some reasonable expectation of privacy in spite of the fact that automobile use is subject to government regulation; the privacy of automobile users may not be "interfered with at the unbridled discretion of police officers." *Id.* at 663. Thus, "except in those situations in which there is at least articulable and reasonable suspicion . . . that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Id.*

---

6. The remainder of the incident is not relevant to our decision in this case. We nevertheless summarize it here for the sake of completeness. After stopping appellants, the agents identified themselves, displayed their credentials, and asked Buenaventura and Quiroz to show them their airline tickets. Appellants displayed their tickets, which were in the names of "Mr. and Mrs. Lopez" (not appellants). The agents then asked for further identification. Quiroz replied that her identification was in her suitcase. The agents asked both appellants to accompany them back into the terminal. Appellants complied. Once inside, Quiroz opened her suitcase and withdrew a large handbag from within. She then opened the handbag

and produced an Ecuadorian passport in her name. While the handbag was open, one of the agents spotted a white plastic bag inside. A subsequent search of the handbag resulted in the discovery of cocaine. Appellants were arrested.

The district court held that Quiroz had consented to the search of her handbag and that, in any event, probable cause existed for the search of the handbag and suitcase. Appellants on appeal challenge the constitutionality of the search. For reasons which are detailed below in this opinion, we do not reach that issue.

7. *United States v. Price, supra*, 599 F.2d at 501.

Three months after its decision in *Prouse*, the Court spoke again on the subject of investigatory stops in *Brown v. Texas, supra*. In *Brown* two police officers spotted a man who "looked suspicious"; when sighted, the man was walking away from another man in an alley located in an area of El Paso which had a high incidence of drug trafficking. According to later testimony, the officers believed that the two men "had been together or were about to meet until the patrol car appeared." 443 U.S. at 48. The officers stopped the suspicious looking man and asked him for identification. The man refused and was arrested. He was convicted of violating a Texas statute requiring persons to give their name and address to police officers who have detained them lawfully and have requested such information.

The Supreme Court reversed the conviction in *Brown* on the ground that the police officers lacked any reasonable suspicion to believe appellant was engaged or had engaged in criminal conduct. *Id.* at, 52. The Court held that, in order to make a lawful investigatory stop, law enforcement officers must "have a reasonable suspicion, based on *objective facts*, that the individual is involved in criminal activity." *Id.* (emphasis added). When the investigatory stop "is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." *Id.*

In *Brown* the Court held that the complex of conduct there—two men, one of whom looked suspicious,[8] separate from each other in an alley located in an area active in drug trafficking—did *not* justify a "reasonable suspicion" that the men were engaged in criminal conduct. In so holding, the Court made it clear that the requirement that there be specific, objective and articulable reasons for subjecting a person to an investigatory stop does not give an officer free rein to act on his own suspicions.

**III.**

We turn next to the recent cases in our Court that have addressed the constitutionality of airport investigatory stops. The seminal case in our Circuit involving airport stops is *United States v. Oates, supra*. In *Oates, supra*, 560 F.2d at 59–60, the suspect was reputed to be a "major narcotics dealer" and the agent who made the stop *was familiar with this reputation*. Furthermore, the suspect was traveling with a person "who was obviously a narcotics addict". The suspect had just come from a rendezvous with a man *known personally to the drug agent* as someone "involved in the drug culture". The agent noticed "distinct bulges" in the clothing of the suspect's traveling companion when the two men returned to the airport after concluding their business in New York. The men appeared nervous and avoided any appearance of knowing each other, although the agents knew them to be acquaintances.

The *Oates* Court concluded that the facts there, "considered as a whole", were sufficient to "pass the threshold of reasonable suspicion necessary to justify the stop which was made in this case." *Id.* at 61. The Court explained that to the trained, experienced agent who made the stop, "[t]here were far too many interrelated factors to have been the result of pure coincidence." *Id.* (quoting *United States v. Lampkin*, 464 F.2d 1093, 1096 (3 Cir. 1972)).

The subject of airport investigatory stops was dealt with again by our Court in *United States v. Rico, supra*. In *Rico*, Agent Whitmore's attention was directed toward three suspects because: one of the suspects walked with an odd gait and tugged uncomfortably at her pants; the three gave the appearance of being separate, yet followed and nodded to one another in the terminal before joining together at the taxi stand outside the terminal; one suspect, *for no*

---

8. The Court noted that the officers in *Brown* were unable to articulate satisfactorily just why the man seized "looked suspicious". In a footnote the Court distinguished this unsupported conclusion from cases in which "a trained, experienced police officer" can "perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." 443 U.S. at 52 n.2.

*apparent reason*, volunteered a patently false explanation for being in the airport; the suspects were traveling with unmarked luggage; the suspects acted extremely nervous; and one suspect repeatedly looked behind and about him while in the terminal and trailing behind the others. Based on these facts, the Court held that Agent Whitmore had a reasonable suspicion that the suspects were engaged in illicit activity. Nevertheless, in reaching this conclusion the Court expressly cautioned that the facts of the case only "narrowly sufficed" to justify the investigatory stop.

Despite the *Rico* Court's indication that the facts of that case stood close to the dividing line between constitutional stops premised on reasonable suspicion and unconstitutional stops based on the subjective hunch of a trained agent, the threshold of reasonable suspicion was lowered still further in the next case in our Court involving an airport stop. In *United States v. Price, supra*, Agent Whitmore engaged in surveillance of the suspect at LaGuardia Airport, then followed him into Manhattan before making an investigatory stop of the suspect when he stepped out of a taxi which had brought him from LaGuardia. As in *Rico*, the suspect in *Price* had arrived at LaGuardia on a flight from a "source city". He appeared nervous and repeatedly scanned the terminal area. The suspect in fact had held up deplaning passengers to stop and scan the terminal immediately upon exiting from the plane. Throughout the period from his arrival at LaGuardia until the investigatory stop in Manhattan, the suspect appeared concerned that he was being watched. In addition to scanning the terminal area repeatedly, the suspect slouched down in his seat during the taxi ride from LaGuardia and could be seen only when he periodically rose up to peer out the back window of the taxi. When the taxi arrived in Manhattan, the suspect once again scanned the street before he would leave the taxi and pick up his luggage.

Other factors also contributed to the agent's suspicion that the suspect in *Price* was involved in drug trafficking. Although he tossed most of his luggage into the taxi trunk without apparent concern, the suspect "cuddled" one specific piece of luggage. This particular bag, moreover, bore no identification tag. Finally, the suspect was so eager to leave the airport that he ran out into the rain to hail a taxi, ignoring a sheltered taxi stand in front of the terminal. There is little doubt that the facts of *Price* were less likely to create a reasonable suspicion of narcotics trafficking than those in *Oates* or *Rico*. However, the suspect acted like a man who had something to hide and was fearful of being caught.

Most recently, our Court considered the constitutionality of airport stops in *United States v. Vasquez-Santiago, supra*, and *United States v. Vasquez, supra*. In *United States v. Vasquez-Santiago*, appellant Vasquez-Santiago disembarked from a plane after arriving at LaGuardia from a source city. After leaving the aircraft, he looked around the terminal in a "suspicious" manner. He continued to glance around and look behind him as he walked through the terminal. It soon became apparent that, while trying to appear separate, Vasquez-Santiago actually was traveling with a companion, Colon. When Vasquez-Santiago entered the baggage area, Colon gave him a hand signal to stop. Later, Colon nodded at Vasquez-Santiago to approach him. Vasquez-Santiago complied. Colon secretively slipped Vasquez-Santiago a small piece of paper. Secretive gestures continued between the two men until the luggage was retrieved. Colon then left the baggage area with Vasquez-Santiago following behind him. Rather than walking straight to the exit, however, Colon walked *in a complete loop* before going through the door. Vasquez-Santiago followed the same route. Only after they had left the terminal and approached the taxi stand outside did the two begin conversing.

In *United States v. Vasquez*, the two suspects, Vasquez and Flores, arrived at LaGuardia on a flight from a source city. They waited until every other passenger had deplaned before leaving the aircraft themselves. Although engaged in conversation while disembarking, they quickly

separated when they reached the corridor. Vasquez followed Flores from the gate to the baggage claim area. While trailing behind Flores, Vasquez twice stopped and *made a complete turn* in order to survey the area. Agent Whitmore's suspicions were aroused because (1) Vasquez approached Flores in order to correct the destination given by Flores to a skycap, then immediately moved away from Flores again, and (2) the two bags claimed by Flores bore no identification tags, although one of the bags was secured by a padlock identical to padlocks which the agent previously had observed attached to luggage containing heroin.

In both *Vasquez-Santiago* and *Vasquez*, the Court found that Agent Whitmore again had reasonable suspicion to believe that the suspects were engaged in criminal conduct. The Court concluded in each case that the facts, when viewed through the experienced eye of Agent Whitmore, provided "specific and articulable" reasons to believe that the suspects were involved in criminal activity.

The line of cases in our Court from *Oates* to *Vasquez* has resulted in a requirement of progressively fewer objective facts to satisfy the threshold requirement of reasonable suspicion. In *Oates* the agent had prior knowledge of the suspect's drug connections to use as a framework for evaluating unusual behavior. In *Rico* there was no prior knowledge but, in addition to the complex of suspicious or unusual behavior, the agent noted the suspect's unnatural walk and tugging at her trousers, facts which objectively can be viewed as indicating hidden contraband. Still the *Rico* Court recognized that the facts only "narrowly sufficed" to justify the stop. *Price, Vasquez-Santiago,* and *Vasquez*, however, contain even fewer *objective* facts linking the suspects to narcotics trafficking. As a result, the agent's *perception* of objectively neutral conduct has taken on an added importance. The

"trained eye" of the narcotics agent has loomed more prominently in our most recent analyses of airport stops, as nervous behavior and perceived attempts by passengers to appear "separate" have emerged as the principal conduct justifying the stop.

## IV.

The cases discussed in the preceding section of this opinion constitute the law of this Circuit. We look primarily to these cases in analyzing the facts before us. The question which we must decide today is whether the holdings of *Oates* and its progeny require us once again to uphold here the constitutionality of Agent Whitmore's investigatory stop. We think not.

■ Viewing the circumstances of the investigatory stop in the instant case as a whole, *United States v. Oates, supra,* 560 F.2d at 61, we conclude that the facts simply do not support a finding that "the complex of conduct that [Agent Whitmore] observed and described would have made an experienced and reasonably cautious law enforcement officer suspicious that the [appellants] were transporting narcotics". *United States v. Rico, supra,* 594 F.2d at 326. Here appellants arrived from a source city, seemed to be nervous and traveled separately in the airport (although they conversed while deplaning and while in the taxi line). The agents in this case had no previous knowledge that appellants were involved in the "drug culture" (*Oates*); there were no suspicious indications of contraband hidden in clothing (*Oates, Rico*); there were no false statements blurted out without reason (*Rico*); there were no suspicious hand signals or papers passed secretly (*Vasquez-Santiago*); there was no objectively bizarre behavior such as suspects following each other while walking in complete circles (*Vasquez-Santiago*); and there was not even unmarked luggage, let alone distinctive padlocks (*Vasquez*).[9]

**9.** We do not suggest that the existence or absence of any specific fact should control the decision in this or any other case. We must recognize, however, that so few objective facts are required at present to support an investiga-

tory stop that the absence of some such facts may be enough in a given case to render a stop unconstitutional. Even the slightest breeze may cause a tightrope walker to fall.

■ That appellants here arrived from a source city and seemed nervous to Agent Whitmore strikes us as wholly insufficient to constitute "specific and articulable" facts supporting a reasonable suspicion that they were involved in drug trafficking.[10] There must be other objective facts which, when viewed in conjunction with nervous behavior and arrival from a source city, raise the complex of conduct to a level justifying reasonable suspicion of criminal activity.[11] In this case, the simple fact that appellants did not travel side by side and were not conversing while walking through the terminal is not enough to create a reasonable suspicion that they were transporting narcotics. In fact, it is quite common for one passenger to rush ahead to the baggage area to "fight the crowds" while his companion follows behind and waits outside the baggage area before rejoining him for the taxi ride into town.[12] Therefore, even when viewed in the context of their arrival from a source city [13] and generally nervous demeanor, there is an eloquent absence in this case of necessary *objective* facts even remotely to suggest that appellants were involved in drug trafficking.

■ In reaching this conclusion, we have given due consideration to Agent Whitmore's experience in the field of monitoring drug trafficking at LaGuardia Airport. *E. g., United States v. Vasquez-Santiago, supra*, 602 F.2d at 1072 n.3; *United States v. Price, supra*, 599 F.2d at 501 n.8. There can be no doubt that the greater the training and experience of a law enforcement officer, the more likely it is that he will be able to perceive and articulate meaning in conduct which would not arouse the suspicions of an untrained observer. *Brown v. Texas, supra*, 443 U.S. at 52 n.2. But the fact that an officer is experienced does not require a court to accept all of his suspicions as reasonable, nor does mere experience mean that an agent's perceptions are justified by the *objective* facts. The "basis of the police action must be such that it can be reviewed judicially by an objective standard." *United States v. Rico, supra*, 594 F.2d at 324. Appellants' actions in this case, giving full weight to the trained eye through which they were viewed, simply do not justify the intrusion of an investigatory stop. If Agent Whitmore, in view of his experience, had thought that appellants' behavior was somehow unusual, then he had reason enough to "look sharp" and continue his surveillance.[14] "But awareness of the unusual, and a proper resolve to keep a sharp eye, is not the same as an articulated suspicion of criminal conduct." *United States v. Price, supra*, 599 F.2d at 500 n.7. The objective facts given by Agent Whitmore as providing the reason for his making the investigatory stop in the instant case do not amount to an articulated, objectively supported suspicion of criminal conduct.

■ Finally, while we view appellants' behavior before the stop in this case as

---

10. *Cf. Brown v. Texas, supra* (investigatory stop of suspicious looking man in area with high incidence of drug trafficking held unconstitutional).

11. We note in passing that this case is very different from *United States v. Price, supra*, where the suspect's conduct clearly indicated that he was afraid of being watched or followed, the suspect was in an unnatural hurry to leave the airport, and the suspect was overly protective of a specific article of unmarked luggage. In *Price*, it was only after the agents followed the suspect into Manhattan and viewed his continued paranoia and efforts to avoid being seen that they were able to form a reasonable suspicion sufficient to justify a stop of the suspect. The mere glancing around and "nervous" behavior of appellants here do not approach the conduct of the suspect in *Price*.

12. Indeed, Agent Whitmore admitted at the suppression hearing that the flight was very crowded and that the baggage area was quite congested at the time. Thus, the conduct of Buenaventura in following Quiroz to the baggage area, trying to keep her in view in the crowded airport, and then staying clear of the crowds at the baggage area until after the baggage was collected seems eminently normal, rather than suspicious.

13. *See* note 5, *supra*.

14. If Agent Whitmore subjectively had suspected appellants of possible wrong-doing, then he was free to follow them after they left the airport. The feasibility of such continued surveillance was demonstrated in *United States v. Price, supra*.

objectively innocent, we do *not* hold that the *mere* fact that conduct is as consistent with innocence as with guilt precludes such conduct from providing the basis for a reasonable suspicion of criminal activity. As our Court in *Price* observed, it is "rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation." [15] Rather, we hold simply that the actions of appellants, viewed as a whole, were not sufficiently unusual to create a reasonable suspicion that appellants were engaging in criminal activity. While appellants' behavior might have caused Agent Whitmore to form a *subjective* hunch that they were involved in drug trafficking, their conduct most assuredly did not provide the specific, objective facts which the Constitution requires before an agent may subject an individual to an investigatory stop.[16]

### V.

We therefore vacate the judgments of conviction and remand the case for further proceedings, with instructions that the evidence seized pursuant to the unlawful investigatory stop be suppressed.

In reaching our decision, we note that the line between investigatory stops based on reasonable suspicion and stops based on the subjective hunches of experienced agents is by no means clear. But if undue reliance is placed upon an agent's "perception" or "interpretation" of observed conduct, then the requirement of specific, objective facts may easily be circumvented. *E.g., United States v. Rico, supra,* 594 F.2d at 324–26. While courts must give appropriate weight to an agent's experience in discerning criminal behavior, they must not abdicate their duty to conduct an independent review of the circumstances surrounding each investigatory stop.

We do not purport to define today the precise dividing line between lawful and unlawful investigatory stops. Suffice it to say that in this case we hold that the line has been crossed.

Vacated and remanded.

---

15. *United States v. Price, supra,* 599 F.2d at 502 (emphasis in original). In fact, not even the stringent standard of "reasonable doubt" requires that actions be such as to exclude every reasonable hypothesis other than that of guilt. *Holland v. United States,* 348 U.S. 121, 139–40 (1954).

16. Consider, for example, the official DEA "profile" of narcotics couriers. While behavior in accordance with this profile may arouse an agent's subjective suspicions, passenger behavior consistent with this profile in and of itself will not satisfy the reasonable suspicion standard. *United States v. Rico, supra,* 594 F.2d at 326.