**UNITED STATES of America**

v.

**Jerome BAPTIST, Defendant.**

**No. 82 Cr. 110 (CBM).**

United States District Court,
S.D. New York.

June 21, 1982.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., by Michael S. Feldberg, Asst. U.S. Atty., New York City, for the U.S.

Theodore T. Jones, Brooklyn, N.Y., for defendant.

OPINION

MOTLEY, Chief Judge.

Defendant Jerome Baptist has moved to suppress physical evidence (two checks allegedly stolen from the United States mail) that was seized from him by a New Jersey police officer on September 22, 1981. An evidentiary hearing was held on the motion on June 7, 1982. At the hearing, Police Officer Vincent DeRienzo, of the Bergen County police testified for the Government. Defendant offered no evidence or testimony.

By order dated June 11, 1982, the court granted defendant's motion to suppress. This opinion sets forth the court's reasons for its disposition of defendant's motion.

*Facts*

On September 22, 1981, at approximately 10:30 A.M., defendant was a passenger in a car driven by Vincent Cassucci. The car was traveling at 35 miles per hour in a 50 mile per hour zone on a six lane highway, flashing its 4-way hazard light and impeding the flow of traffic. Police Officer DeRienzo testified that after the car had passed two open gas stations, and at a point where the highway was about to narrow to four lanes, he stopped the car. He testified that he stopped the car so that traffic would not be further impeded (Tr. 6–7). The officer then approached the car and asked the driver for a license, registration, and insurance card. Cassucci stated that he did not have his driver's license in his possession, but gave the officer an insurance card and the car registration. The officer radioed this information into police headquarters and ascertained that Cassucci's license had been suspended.

Officer DeRienzo then returned to the car and asked the passenger, Baptist, if he had a license. The officer testified that he asked this question as a courtesy, because if neither Baptist nor Cassucci had a valid license, he would have had to impound the vehicle (Tr. 8). There was no testimony concerning the condition of the car. After Baptist stepped out of the car without an-

**286**

swering, the officer told him to move to the back of the vehicle, where there was more room. Baptist did so, and then reached into his left front pants pocket and withdrew a billfold containing papers. As he did this, some of the papers fell out of his pocket onto the ground.

The officer testified that "at this time ... he (Baptist) had become very nervous... [H]e was fumbling with the papers in his hand and shaking" (Tr. 10). Baptist then asked if he could go to the bathroom, and, at the same time, placed his left foot over the papers that had dropped to the ground.

The officer told Baptist that he could not go to the bathroom and then asked Baptist what was under his left foot (Tr. 10). Baptist replied that it was something for his mother (Tr. 10). Officer DeRienzo then reached down and picked up from under Baptist's foot two plain business-sized envelopes, with no markings or addresses on them, which were folded together but which had been ripped open. After Baptist asked the officer a second time if he could go to the bathroom, and the officer denied the request, the officer asked a second time about the contents of the envelopes. Baptist replied that he did not know what was in the envelopes and that he had found them in New York. At this point the officer opened the envelopes and examined the contents. He found in one envelope a check for $174,000.00, and in the other a check for approximately $24,000.00.[1]

*Discussion*

The opening of Baptist's envelopes was preceded by several actions taken by Officer DeRienzo, each of which must be examined separately by the court. After careful consideration, the court concludes that while the initial stopping of the vehicle and the request that the driver produce a license was proper, the subsequent detention of Baptist and the seizure of his envelopes ran afoul of the Fourth Amendment's proscription against unreasonable searches and seizures. Accordingly, the motion to suppress the fruits of the illegal search and seizure is granted.

*The Stopping of the Car and the Questioning of Cassucci*

■ The legitimacy of the stop of Cassucci's car must be examined in light of the Supreme Court's holding in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). There, addressing the propriety of a random spot check of an automobile to check a driver's license and registration, the Court held that "except in those situations where there is at least articulable and reasonable suspicion that a motorist is unlicensed or an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his license and the registration of the automobile are unreasonable under the Fourth Amendment." 440 U.S. at 663, 99 S.Ct. at 1401. While *Delaware v. Prouse* thus makes clear that a driver may be stopped for a violation of the traffic laws and asked to produce a license, there was no testimony here that Cassucci was actually violating the laws of New Jersey when stopped by Police Officer DeRienzo. The court concludes, however, that because Cassucci was traveling well below the speed limit, with his hazard light flashing, and impeding the flow of traffic, it was reasonable for the officer to have stopped the car as a safety measure.

1. While the events subsequent to the discovery of the checks are not relevant to the court's decision on the instant motion, it will briefly state them. After discovering the checks, the officer requested assistance at the scene. A cursory search of the car was made, and a miniscule quantity of cocaine was found in a rolled-up dollar bill in a cigarette package under the visor on the driver's side. The defendant and Cassucci were placed under arrest for possession of cocaine.

Counsel for defendant stated at the hearing on the instant motion that in the subsequent prosecution of Cassucci and Baptist in New Jersey State Court for possession of cocaine, the court granted defendants' suppression motion on the ground that the initial stop of the car was illegal. The Assistant United States Attorney in this case did not dispute this statement.

The next question is whether Officer DeRienzo's request that Cassucci produce his license was improper under the circumstances. This issue was addressed by the Fifth Circuit in *United States v. Marlow,* 423 F.2d 1064 (5th Cir.1970). In *Marlow,* police officers had approached a stalled car to offer assistance to the driver. They subsequently asked for a driver's license, which the driver could not produce. The police then asked the driver to step from the car and show some identification. Rejecting the defendant's arguments that this procedure constituted a custodial search or arrest, the court held that in Texas, where a statute authorized such conduct, a police officer could ask a driver of a vehicle to produce his license, without implicating the Fourth Amendment. *Id.* at 1065. While the Second Circuit has not decided this precise issue, the court concludes that under the facts presented here, the request that Cassucci produce a license was only incrementally more intrusive than the initial stop, and not violative of the Fourth Amendment. This does not, however, answer the question of whether the subsequent detention and questioning of Baptist ran afoul of Baptist's Fourth Amendment rights.

*The Stopping and Questioning of Baptist*

■ Defendant asserts that from the moment he was approached by Officer DeRienzo, he was subjected to a seizure within the meaning of the Fourth Amendment. Defendant characterizes this seizure as an arrest, and argues that it was without probable cause. The court does not view Officer DeRienzo's refusal to let Baptist leave and go to the bathroom as an arrest, but rather as an investigatory stop within the meaning of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigatory stop is deemed to have occurred when an "officer by means of physical force, or by show of authority, has in some way restrained the liberty of a citizen. . . ." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16. *See also Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (stop of an individual to ask for identification, pursuant to a Texas statute making it a crime to refuse to identify oneself to a police officer, implicates Fourth Amendment rights).

■ Whether or not a seizure has occurred is not determined by the subjective intent of the officer. Rather, the test is whether or not the objective facts would lead a reasonable person to conclude that he was not free to leave. *See United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *Delaware v. Prouse, supra,* 440 U.S. at 654, 99 S.Ct. at 1396; *United States v. Jackson,* 652 F.2d 244, 250 (2d Cir.1981), *cert. denied* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981); *United States v. Oates,* 560 F.2d 45, 58 (2d Cir.1977).

Here, Officer DeRienzo's refusal to let Baptist leave to go to the bathroom was an exercise of authority that restrained Baptist's liberty. The fact that defendant felt that he had to ask the officer's permission to go to the bathroom evinces Baptist's subjective determination that he was being detained. Further, the officer's subsequent denial of defendant's request to leave is objective evidence that would lead a reasonable person to conclude that his freedom of movement was curtailed. This case thus falls within the guidelines of *Terry v. Ohio, supra.*

In *Terry,* the Court held that a detention short of an arrest may be sustained on less than probable cause only if the search or seizure is "reasonable." The court went on to conclude that the stop may be considered reasonable if an officer can point to "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* 392 U.S. at 21, 88 S.Ct. at 1879. Later cases have construed this to mean that an officer must have a reasonable suspicion that criminal activity is occurring. *See Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); *Brown v. Texas, supra,* 443 U.S. at 51, 99 S.Ct. at 2640; *Delaware v. Prouse, supra,* 440 U.S. at 663, 99 S.Ct. at 1401. Once the minimal level of suspicion is established, to then determine whether the intrusion is reasonable, the

**288**

court must balance the governmental interests with the nature and quality of the intrusion on the individual's rights. *Terry v. Ohio, supra,* 392 U.S. at 22–24, 88 S.Ct. at 1880–1881.

■ The Second Circuit has examined the propriety of investigatory stops, primarily in the context of the detention of individuals in airports who are suspected of smuggling drugs. The Supreme Court has also considered investigatory stops in this context, *see Reid v. Georgia, supra,* in the context of automobiles, *Delaware v. Prouse, supra,* and of pedestrians on city streets, *Brown v. Texas, supra; Terry v. Ohio, supra.* The teaching of these cases is that in order to be sustained, an investigatory stop must be based on specific and articulable facts, supporting a reasonable suspicion that the defendant is involved in specific criminal activity. Where that standard has not been met, the investigatory stop is held improper.

In *United States v. Buenaventura,* 615 F.2d 29 (2d Cir.1980), a case involving two men stopped and later arrested at an airport for the possession of heroin, the court granted the defendants' motion to suppress on the ground that "the facts simply do not support a finding that 'the complex of conduct that [Agent Whitmore] observed and described would have made an experienced and reasonably cautious law enforcement officer suspicious that the [appellants] were transporting narcotics.'" *Id.* at 35, *citing United States v. Rico,* 594 F.2d 320, 326 (2d Cir.1979).

In *Buenaventura,* although the defendants: 1) had arrived from a "source city"; 2) manifested nervousness; and 3) traveled together, then separated and then reunited (an accepted indicia of drug trafficking), the court concluded that the objective facts

observed were not enough to create the level of suspicion needed to sustain the intrusion. *Id.* at 36. *Cf. Brown v. Texas, supra* (investigatory stop of suspicious-looking man in an area with a high incidence of drug trafficking held unconstitutional).

In upholding Buenaventura's claim, the court distinguished *United States v. Price,* 599 F.2d 494 (2d Cir.1979), in which the Second Circuit, on the lowest level of suspicion thus far,[2] sustained an investigatory stop. In *Price,* the defendant had arrived from a "source city," appeared nervous, and held up deplaning passengers as he scanned the airport. At the luggage area, he again scanned the faces of those around him and "cuddled" one piece of luggage which bore no identification (a characteristic which fits the Drug Enforcement Administration drug profile). *United States v. Buenaventura, supra,* 615 F.2d at 34. The agent in *Price* then followed the suspect out of the airport and into the city, and observed further furtive behavior before he made the investigatory stop. The agent thus had the opportunity to observe the defendant's behavior over a long period of time, before determining that there was a reasonable suspicion of drug trafficking.

■ In the instant case, the "specific and articulable facts" supporting Officer DeRienzo's "reasonable suspicion" of criminal activity do not approach those in *Price,* or, for that matter, in *Buenaventura.* At the time that Officer DeRienzo denied Baptist's request to go to the bathroom, thus curtailing his freedom of movement and making an investigatory stop within the meaning of *Terry,* the only specific objective facts which supported the stop were: 1) Baptist's nervousness; 2) Baptist's request to go to the bathroom; and 3) Baptist's act of stepping on the envelopes when they fell out of

---

**2.** As the court noted in *United States v. Place,* 660 F.2d 44, 49 (2d Cir.1981), in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), "an end was put to the gradual relaxation of factors justifying reasonable suspicion." *Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754. In *Reid,* the Court held that DEA agents at the airport "could not as a matter of law, have reasonably suspected the petitioner

of criminal activity on the basis of these observed circumstances." The objective facts in Reid were: 1) petitioner arrived from a source city, 2) he arrived in early morning when law enforcement activity was down, 3) he appeared to conceal the fact that he was traveling with his companion, and 4) he apparently had no luggage other than his shoulder bag. *Reid* at 441, 100 S.Ct. at 2754.

his pocket. Mindful of the fact that conduct equally indicative of innocence as of guilt may serve as a basis for a "reasonable suspicion," *Buenaventura, supra,* 615 F.2d at 37, the court notes that nervousness on the part of one stopped by a police officer is not at all unusual, and asking to go to the bathroom may well be a mere manifestation of that nervousness. Further, Baptist, who was standing on the side of a highway where cars were traveling at 50 miles per hour, may well have stepped on the papers to prevent them from blowing away. In any case, these factors, taken together, simply do not support a reasonable suspicion that Baptist was engaged in specific criminal activity when initially detained. To paraphrase *Buenaventura,* even when viewed in the context of Baptist's general nervousness, there is an "eloquent absence in this case of necessary *objective* facts," even remotely suggesting that Baptist was involved in criminal activity. 615 F.2d at 36. (emphasis in the original)

Even if the officer's first denial of Baptist's request to go to the bathroom is not considered a *Terry* stop, his second denial of Baptist's second request to relieve himself clearly communicated to Baptist that he was not free to leave. By the time that this occurred, Baptist had told Officer DeRienzo, in response to DeRienzo's inquiry about the contents of the envelopes, that these plain envelopes contained something for his mother. This fact, even when added to those discussed above, does not provide a basis for a reasonable suspicion that Baptist was engaged in specific criminal activity.

The Government relies heavily on the subsequent, contradictory statement of Baptist with regard to what was in the envelopes in order to establish that Officer DeRienzo had the requisite reasonable suspicion here. Because the court has decided that the *Terry* seizure occurred prior to the second statement (i.e. when the officer denied Baptist's second request to leave), it need not decide whether the contradictory statement, together with the other objective facts, created a reasonable suspicion of criminal activity. As stated by Judge Dooling, " . . . what developed from the investigative stop could not justify it." *United States v. Rico, supra,* 594 F.2d at 323.

Another factor distinguishing this case from *United States v. Price, supra,* and the cases relied upon by the Government, is that there is no allegation that Officer DeRienzo is experienced or trained in the detection of the crime which he eventually uncovered. *Cf. United States v. Vasquez,* 612 F.2d 1338 (2d Cir.1979), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 852 (1980); *United States v. Vasquez-Santiago,* 602 F.2d 1069 (2d Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980); *United States v. Price, supra; United States v. Rico, supra; United States v. Oates, supra.* Indeed, Officer DeRienzo testified that he had only two and one-half years experience, (Tr. 5), and no specific experience in investigating stolen checks.

More important is the fact that Officer DeRienzo did not testify that he believed Baptist was engaged in any specific criminal activity when the officer detained him. *Cf. Brown v. Texas, supra* (narcotics dealing); *United States v. Buenaventura, supra,* and cases cited therein, (drug trafficking); *Terry v. Ohio, supra,* (robbery of a particular store). Instead, he testified that prior to detaining Baptist, he had received no reports of stolen checks (Tr. 21). Furthermore, given the flatness of the envelopes, the officer could not reasonably have believed that they contained quantities of narcotics or weapons. In such a situation, where an officer can point to no specific criminal activity in which he believes the suspect is engaged, to permit a *Terry* stop and questioning would do nothing but contribute to "unfettered discretion of officers in the field." *Brown v. Texas, supra,* 443 U.S. at 51, 99 S.Ct. at 2640. Although the line between permissible and impermissible investigatory stops is indeed fine, as it must be, the court is of the view that a stop based on a mere subjective hunch that something is amiss, supported almost exclusively by the suspect's nervousness, is impermissible.

### The Seizure of the Envelopes

 Even assuming that the stopping and questioning of Baptist was only minimally intrusive and thus permissible, the seizure of the envelopes from under his foot was clearly improper. The distinction between an investigatory stop, "[a] brief stop of a suspicious individual, in order to determine his identity, or to maintain the status quo momentarily, . . . ." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), and the seizure and search of his possessions is important. It is well established that the permissibility of an initial stop does not establish the permissibility of the search or frisk. *See United States v. Oates, supra,* 560 F.2d at 61. This proposition becomes clearer when one examines the Second Circuit cases concerning stops and the searches following them. In all cases in which defendants were stopped for questioning under reasonable suspicion, and later had their possessions searched, the subsequent search was upheld by either probable cause, *see e.g., United States v. Jackson, supra,* or as a protective measure, *see Terry v. Ohio, supra; United States v. Walker,* 576 F.2d 253 (9th Cir.1978), *cert. denied,* 439 U.S. 108, 99 S.Ct. 865, 59 L.Ed.2d 51 (1978); *United States v. Vigo,* 487 F.2d 295 (2d Cir.1973), or after the defendant gave his consent. *United States v. Marin,* 669 F.2d 73 (2d Cir.1982); *United States v. Vasquez, supra.*

Here, as discussed above, the statements made by Baptist prior to the seizure of his envelopes did not afford the officer probable cause to search his belongings. Furthermore, because Officer DeRienzo alleged no fear that Baptist was armed or dangerous, and because the envelopes were not of the dimensions to contain a weapon, it cannot be argued that the seizure of the envelopes was a protective measure taken by the officer. Finally, there is no allegation that Baptist consented to the search made here. The question then becomes whether the objective events perceived by Officer DeRienzo prior to the seizure of the envelopes were sufficient to sustain the seizure. The court concludes that they were not.

This conclusion, as discussed earlier, is based on the fact that there were not sufficient specified, objective facts here to sustain a reasonable suspicion that Baptist had engaged or was about to engage in specific criminal activity. Moreover, the scope of the intrusion involved in the seizure of the envelopes—a "central element" in the court's analysis of the reasonableness of the seizure, *United States v. Price, supra,* 599 F.2d at 499, *citing Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879 is much higher with an actual seizure of one's property than it is with a mere stop and subsequent questioning. *See also United States v. Place,* 660 F.2d 44, 51 (2d Cir.1981). The intrusion is particularly high where, as here, the seizure of items as personal as one's envelopes is involved. When this high level of intrusion is balanced against the need for it here, where no specific safety factor is involved, no specific criminal activity is alleged, and the objective facts from which inferences could be drawn are few, the court can only conclude that the intrusion was not warranted and that the illegal fruits of the seizure must be suppressed.

### The Plain View Doctrine

 Finally, the Government contends that the seizure of the envelopes was proper under the plain view doctrine. This doctrine requires that the officer "have a prior justification for the intrusion" and that he "come inadvertently across a piece of evidence." The final limitation, clearly not satisfied here, requires that the evidence be incriminating on its face. *See Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *United States v. Berenquer,* 562 F.2d 206, 210 (2d Cir.1977) (the object's "incriminatory nature must be immediately apparent."). As stated in *United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.1979), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1980), *reh. denied,* 444 U.S. 1027, 100 S.Ct. 695, 62 L.Ed.2d 663 (1980). "[t]he incriminating nature of the object is generally deemed immediately apparent when police have probable cause to believe it is evidence of a crime."

The Government maintains that *United States v. Duckett*, 583 F.2d 1309 (5th Cir. 1978), is a case "precisely on point." (Gov't Memorandum at 14). In *Duckett*, after the defendant was stopped for driving without a license plate light, the officer ascertained that the driver had no valid license. After arresting the defendant, and while waiting to have the van towed, the officer saw two Treasury Department envelopes in the van, addressed to parties other than the driver. In upholding the subsequent search of the envelopes, the court concluded that the officer "had probable cause to believe and did in fact reasonably believe" that the defendant had committed the offense of stealing mail. 583 F.2d at 1314. Critical to the court's decision was the fact that the officer saw that the return address on the envelopes was that of an administrative agency, and that the name of the addressee was someone other than Duckett.

In contrast to *Duckett*, the officer here had no such immediately incriminating factors to rely on. The envelopes were plain, white business envelopes with no addressee or return address written or printed on them. There was no indication that the envelopes contained any mail at all, let alone illicit material. Although the fact that defendant stepped on the envelopes may have brought them to Officer DeRienzo's attention, there was nothing on their face, and no link to any other incriminating material, to make it "immediately apparent" that they contained evidence of crime. Accordingly, the plain view doctrine is inapplicable.