UNITED STATES of America, Appellee,

v.

Carlos Manuel HERNANDEZ,
Appellant.

No. 87–5430.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1988.

Decided Aug. 15, 1988.

Randal D.B. Tigue, Minneapolis, Minn., for appellant.

Richard E. Vosepka, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge,
WOLLMAN, Circuit Judge, and
BROWN,* Senior Circuit Judge.

WOLLMAN, Circuit Judge.

Carlos Manuel Hernandez appeals from his conviction of possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1982), contending that the district court[1] erred in (1) denying his motion to suppress approximately 24½ ounces of cocaine and inculpatory statements that Herndandez alleged had been obtained in violation of the fourth amendment; and (2) finding the identification of the cocaine to be legally sufficient. We affirm.

On February 11, 1987, Drug Enforcement Administration (DEA) Special Agents Jerry J. Kramer and Bruce Giller observed the passengers arriving at Gate 46 at the Minneapolis–St. Paul International Airport. They knew that a person using the name "Carlos Fernandez" was flying into Minneapolis from Miami via Atlanta and that because of his seat assignment would be approximately the 40th person to leave the plane. A few months previously, a "Carlos Hernandez" had flown into Minneapolis from Miami.

Hernandez, the 40th person to come through the gate, looked from side-to-side more than did other passengers. The agents surveilled Hernandez as he proceeded to the main terminal. After eating a sandwich at a fast food restaurant, Hernandez removed from his carry-on bag a brown plastic pill container without a prescription label and took out a capsule. Hernandez then walked to a clothing display where, after stopping to pick up a brochure, he turned completely around to survey the area before continuing on toward an exit. When the exit doors opened, Hernandez again turned completely around, walked back into the airport and took an elevator down to the lower level, where, after peering out of the corner of his right eye, he left the terminal through an exit.

As the agents followed Hernandez outside, Agent Kramer said, "Sir." Hernandez continued walking, crossing the street in a zigzag pattern. Agent Kramer then said, "police officers," and displayed his badge. Hernandez stopped, whereupon Kramer inquired, "May we speak to you for a moment? You're not under arrest. You're free to go. Did you just fly in from somewhere?" Transcript at 26. Hernandez responded that he had come from Atlanta, without mentioning that his journey had begun in Miami. Hands shaking, Hernandez was unable to find his ticket. He appeared to be extremely nervous. For identification, Hernandez produced a social security card bearing the name Carlos Hernandez. Agent Kramer asked Hernandez' permission to search his bag and to conduct a pat-down search. Hernandez kicked his bag and raised his arms, elbows out, to indicate that he had no objection. In the carry-on bag the agents found a clear plastic bag containing chunks and powder of a white substance. The agents placed Hernandez under arrest and advised him of his *Miranda* rights. En route to the police

1. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

station, Hernandez admitted that he had made one similar trip from Miami. He further acknowledged as correct the results of the field test determining that the bag contained approximately 24½ ounces of pure cocaine.

The district court denied Hernandez' motion to suppress the evidence seized, accepting the magistrate's [2] findings that the encounter between the DEA agents and Hernandez was not a seizure within the meaning of the fourth amendment and that Hernandez had consented to the search. The jury found Hernandez guilty of possession with intent to distribute cocaine as charged in the indictment. He was sentenced to nine years' imprisonment, with a special parole term of five years.

## I.

■ Our analysis begins with determining into which one of the three categories of police-citizen encounters the encounter between the DEA agents and Hernandez falls. *See United States v. Poitier,* 818 F.2d 679, 681–82 (8th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 700, 98 L.Ed. 2d 651 (1988). The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions. Because this encounter in a public place is consensual, it does not constitute a seizure within the meaning of the fourth amendment. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983).

■ The second category of police encounter is the so-called *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968). Police officers may justifiably restrain an individual for a short period of time if they have an "articulable suspicion" that the person has committed or is about to commit a crime. *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324. An initially consensual encounter is transformed into a seizure when, considering all of the circumstances, a reasonable person would believe that he is not free to

leave. *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). The final category is a full-scale arrest, which must be based on probable cause. *Poitier,* 818 F.2d at 682.

We review the district court's findings of historical facts under the clearly erroneous standard, and the ultimate conclusion of whether the fourth amendment has been violated is subject to *de novo* review. *United States v. Campbell,* 843 F.2d 1089, 1092 (8th Cir.1988).

■ The district court did not err in accepting the magistrate's conclusion that Hernandez was not seized when he consented to the search of his carry-on bag. The agents approached Hernandez on the street outside of the airport and he agreed to talk with them. Hernandez' failure to stop until the DEA agents identified themselves as police officers did not convert the consensual encounter into a seizure. *Royer,* 460 U.S. at 497, 103 S.Ct. at 1323. Moreover, Agent Kramer specifically explained to Hernandez that he was free to go and asked permission to speak with him. The conversation and search occurred in public, not in a police interrogation room. The officers did not display their firearms. We conclude that in light of these circumstances, a reasonable person would not think that he was being detained.

■ Relying on four of our prior cases, Hernandez nevertheless contends that the encounter rose to the level of a *Terry*-type seizure that was not justified by an articulable, reasonable suspicion of criminal activity. *See United States v. Sadosky,* 732 F.2d 1388 (8th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984); *United States v. Ilazi,* 730 F.2d 1120 (8th Cir.1984); *United States v. Large,* 729 F.2d 636 (8th Cir.1984); *United States v. Wallraff,* 705 F.2d 980 (8th Cir.1983). Specifically, Hernandez contends that the encounter was transformed into an investigative stop when Agent Kramer indicated, prior to requesting permission to search, that he suspected Hernandez of carrying drugs.

**2.** The Honorable J. Earl Cudd, United States Magistrate for the District of Minnesota.

In *Sadosky*, we determined that an initially consensual police encounter was transformed into a seizure when DEA agents informed Sadosky, after he indicated to the agents that he would refuse to comply with their request for identification unless he was under arrest, that they were investigating possible narcotics violations and that they wanted to question Sadosky because of his unusual behavior. *Sadosky*, 732 F.2d at 1392. We concluded that these statements not only indicated that the investigation was focused on Sadosky but also implied that his failure to cooperate could lead to his arrest. *Id.* at 1392–93.

Here, in contrast, the agents never implied that Hernandez' failure to cooperate could lead to his arrest. Although the agents indicated, prior to searching Hernandez' bag, that they suspected him of carrying drugs, the record does not show that the agents made this statement to coerce Hernandez into cooperating with them.

In *Ilazi*, we classified as a seizure that was justified by an articulable suspicion of criminal activity an encounter with DEA agents in which Ilazi produced an Immigration and Naturalization Service form, an airline ticket, and driver's license. We did not, however, analyze what transformed the initial encounter into an investigatory stop. *Ilazi*, 730 F.2d at 1124. We subsequently made clear that a display of badges and a request for information does not turn consensual questioning into an investigatory stop. *Poitier*, 818 F.2d at 682–83. There, we held that it was only after the agents had read the defendant her *Miranda* warnings that a reasonable person would not have felt free to leave. *Id.* Here, in contrast, the agents did not advise Hernandez of his *Miranda* rights until after they discovered the cocaine in his bag.

The encounters in *Large* and *Wallraff* were much more intrusive than the encounter in Hernandez' case. In *Large*, we held that a seizure subject to the protection of the fourth amendment had occurred when agents seized the defendant's suitcase after he refused to consent to a search. *Large*, 729 F.2d at 638. Similarly, in *Wall-*

*raff*, DEA agents detained the defendant's airline ticket envelope and suitcase. *Wallraff*, 705 F.2d at 986. Because Hernandez' bag was not seized, however, Hernandez cannot rely on those cases as support for his contention that his encounter with the agents constituted a seizure.

■ The government argues that even if the encounter became an investigatory stop, it was justified because the agents had a reasonable and articulable suspicion that Hernandez was carrying drugs. We agree. Hernandez was traveling under an assumed name from Miami to Minneapolis with only carry-on luggage. The agents knew he had made the same trip a few months previously. He looked from side-to-side more than other passengers typically do, and twice turned completely around to see if anyone was following him. The agents observed prescription bottles without labels in his bag. He crossed the street in a zigzag manner and appeared very nervous when the agents approached him. He could not find his ticket and told the agents that he had flown in from Atlanta when in fact he had started his journey in Miami. These facts led Agent Kramer, an experienced DEA agent, to suspect that Hernandez was carrying drugs. As we stated in *Poitier*:

> In deciding whether the requisite degree of suspicion exists, we view the agents' observations as a whole, rather than as discrete and disconnected occurrences. Further, these observations must be viewed through the eyes of persons who, like the agents in this case, are trained to cull significance from behavior that would appear innocent to the untrained observer. * * * A suspect's displaying characteristics of the drug courier profile, when coupled with untruthful answers given to police questioning, together may constitute sufficient basis for an investigative, *Terry*-type seizure.

818 F.2d at 683. We therefore hold that even if the encounter was transformed into an investigative stop, it was justified by an articulable, reasonable suspicion that Hernandez was carrying drugs.

## II.

■ Hernandez also challenges his conviction on the ground that the identification of the cocaine was legally insufficient because it was based on tests that merely compared the substance seized with a substance known to be cocaine, without performing an independent test to verify that that known substance was cocaine. In *United States v. Jones,* 687 F.2d 1265, 1268 (8th Cir.1982), we concluded that the district court did not err in admitting expert testimony that a seized substance was cocaine even though the witness had not personally tested the comparison sample. *See also United States v. Hollman,* 541 F.2d 196, 200–01 (8th Cir.1976). Likewise here, we conclude that the laboratory identification of the cocaine was legally sufficient.

The judgment is affirmed.

1. The Hon. Robert G. Renner, United States District Judge for the District of Minnesota.

