Samir QUARLES, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 113, 1996.

Supreme Court of Delaware.

Submitted: Jan. 22, 1997.
Decided: June 18, 1997.

Joseph M. Bernstein, Wilmington, for Appellant.

John Williams (argued), Deputy Attorney General, Department of Justice, Dover; Kim E. Ayvazian, Deputy Attorney General, Department of Justice, Georgetown, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ, constituting the Court en banc..

WALSH, Justice (for the majority).

In this appeal from the Superior Court, the appellant, Samir Quarles ("Quarles") seeks a reversal of a ruling that denied his motion to suppress evidence of illegal drugs seized from his person during a street encounter with police. The Superior Court rejected Quarles' contention that the police lacked "reasonable suspicion" to detain him or, alternatively, that even if the stop was sustainable, the subsequent consent to search his person was not voluntary. We conclude that under a totality of circumstances test the conduct of the appellant, measured from the perspective of experienced police officers, provided a specific and articulable basis for a limited investigative stop. We further conclude that the Superior Court's factual determination that Quarles consented to a search of his person is supported by the record. Accordingly, the judgment of the Superior Court is affirmed.

I

The facts underlying the Superior Court's ruling are drawn from the testimony presented at a pretrial suppression hearing. That testimony, partially in conflict, concerned the stop and eventual arrest of Quarles, and a codefendant Michael Thomas ("Thomas"), by officers of the Wilmington Police Department on September 15, 1995 near the Wilmington bus terminal at Second and French Streets.

At approximately 10:00 p.m. on the date in question, Officers Looney and Solge went to the terminal to meet a bus arriving from New York City. Based on their past experience, the officers were aware that the bus in question was often used by persons acting as drug couriers. It was their intention to conduct surveillance of persons departing the bus with the hope of intercepting the flow of drugs into the city. As they watched, fifteen to twenty passengers disembarked from the bus with two individuals, later identified as Quarles and Thomas, exiting last.

Although Quarles and Thomas were conversing as they left the bus, their conversation "came to an abrupt halt" as soon as they observed two uniformed officers standing

nearby. The conversation was not reinitiated once the pair passed the officers. The pair then stood motionless on the sidewalk for a few moments before turning to walk north toward Second Street in the opposite direction of the police. The police observed as Quarles began walking at a faster pace ahead of Thomas, who eventually caught up with Quarles after some distance. As Quarles and Thomas proceeded quickly toward Second Street, Quarles looked back on three different occasions to determine the location of the police officers. When Quarles and Thomas reached the intersection of Second and French Streets they turned west on Second Street. After they turned the corner, Quarles observed a third officer, Officer Cunningham, sitting in his patrol car in a parking lot a short distance ahead on Second Street. Upon observing Cunningham's vehicle, Quarles backtracked to the corner and looked around to determine where the two officers on foot were located. According to the officers, Quarles and Thomas seemed "kind of surprised" and in a quandary as to what direction to proceed. At that point Officers Looney and Solge approached the pair and Officer Solge asked if he could speak to them. Quarles and Thomas agreed to speak with the officers.

In the meantime, Officer Cunningham, who had been in radio contact with the other two officers, proceeded the wrong way on Second Street, against traffic, and parked his vehicle partially on the sidewalk prior to joining the group gathered at the corner. The defendants gave inconsistent statements as to their destination and appeared nervous in answering questions about their origin and destination. They were advised that the police were checking for drugs and/or weapons couriers and were asked if they had any drugs or contraband on their persons. The police requested permission to conduct a search of their persons as well as of a bag carried by Quarles. Quarles testified that he consented only to a search of his bag. The police proceeded to search both Quarles' bag and his person, uncovering a large quantity of cocaine in Quarles' boot.

Although the State argued in the Superior Court that the police had not detained the two suspects and that the encounter was consensual, the Superior Court ruled to the contrary holding that the defendants had been "seized," thus requiring a showing that the officers had a "reasonable articulable suspicion" of wrongdoing sufficient to justify stopping the defendants. The court further concluded that the officers proffered a sufficient explanation to justify the seizure and that Quarles had consented to the body search.

II

In this appeal we first consider Quarles' contention that the Superior Court erred by admitting evidence which was seized by police incident to an allegedly invalid investigatory stop. Quarles argues that the encounter between himself and the police amounted to a "seizure," in violation of his rights under the Fourth Amendment to the United States Constitution, because the police lacked justifiable grounds to detain him. In addition, he argues that the search which resulted in the discovery of drugs on his person was conducted in the absence of his consent. Having carefully weighed the protections afforded Quarles under the Fourth Amendment against the totality of circumstances perceived by the police officers on the scene, we conclude that the police had a sufficient basis upon which to detain Quarles. We further conclude that the Superior Court's factual determination that Quarles, in fact, consented to a search which revealed the illegal drugs is factually supportable.

The Fourth Amendment affords the citizenry the right to be free from unwarranted governmental searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 1872–73, 20 L.Ed.2d 889 (1968). A "seizure" within the meaning of the Fourth Amendment occurs when a suspect is physically forced to stop or when a suspect submits to a show of authority by the police. *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). When evaluating whether a seizure has occurred, a reviewing court looks to see if, under all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he/she was not free to

terminate the encounter with the officers. *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2388–89, 115 L.Ed.2d 389 (1991).

Two categories of police-citizen encounters which constitute seizures under the Fourth Amendment have been recognized. The first is a limited intrusion in which the police restrain an individual for a short period of time. *United States v. Hernandez,* 8th Cir., 854 F.2d 295, 297 (1988). This is commonly referred to as a *Terry*-stop and requires that the officers have a reasonable articulable suspicion that the suspect has committed or is about to commit a crime. The second and more intrusive seizure occurs when the police effectuate an arrest of a suspect for the commission of a crime. *Id.* A full-scale seizure of this type may occur only when police have established probable cause that the suspect has committed a crime.[1] *Id.* The question presented to this Court is whether the police approached Quarles in such a manner that he felt compelled to yield to the officers' control and if so, whether the police had an articulable basis to suspect he was committing a crime.

We concur with the findings of the Superior Court that the police conduct did constitute a seizure. Shortly after exiting the bus, Quarles and his companion caught the attention of Officers Looney and Solge, who proceeded to follow the two suspects north on French Street towards Second Street. As the two proceeded west on Second Street, Officer Cunningham drove his marked police car east on Second Street, against the flow of traffic, pulled his vehicle halfway up on to the sidewalk, and stopped just west of where Quarles was standing. At this point, Quarles found himself positioned between Officer Cunningham and Officers Looney and Solge. When approached by the three officers under these conditions, Quarles' stopping was an act of submission to a show of authority by the police. In view of all the circumstances, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446

U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). This was clearly a Fourth Amendment seizure.

Having found a seizure, we now focus on whether the police conduct can survive constitutional scrutiny. Under the Fourth Amendment, a police seizure can be justified only when, based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the belief that a crime is being or has been committed. *Terry,* 392 U.S. at 17–18, 88 S.Ct. at 1877–78. Under this standard, the courts must look for a minimal level of objective "justification" for making the stop. *U.S. v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). This burden of proof is "considerably less" than proof by a preponderance of the evidence and less demanding than probable cause. *Id. See also Robertson v. State,* Del.Supr., 596 A.2d 1345, 1352 (1991) (Quantum of evidence necessary for reasonable suspicion is less than that required for probable cause). When conducting its analysis, the court must consider the totality of the circumstances, the "whole picture," as viewed through the eyes of a police officer who is experienced in discerning the ostensibly innocuous behavior that is indicative of narcotics trafficking. *U.S. v. Forero–Rincon,* 2d Cir., 626 F.2d 218, 222 (1980).

The United States Supreme Court has stated that the circumstances must be evaluated under an objective/subjective standard as opposed to a purely objective standard. This reflects the reality that:

> [m]uch of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs … may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

*United States v. Place,* 462 U.S. 696, 704 n. 5, 103 S.Ct. 2637, 2643 n. 5, 77 L.Ed.2d 110 (1983) (citing *Mendenhall,* 446 U.S. at 561,

---

1. Consensual encounters are not deemed to be seizures and do not implicate the Fourth Amendment. *See Bostick,* 501 U.S. at 439, 111 S.Ct. at 2388–89. Similarly, a seizure does not occur

simply because police approach an individual and ask a few questions based on a hunch. *United States v. Manuel,* 10th Cir., 992 F.2d 272, 274 (1993).

100 S.Ct. at 1880–81). It logically follows that a pattern of behavior interpreted by an untrained observer as innocent could justify an investigatory stop when viewed by experienced law enforcement agents who are cognizant of current drug trafficking operations.[2] *United States v. Cortez,* 449 U.S. 411, 418–19, 101 S.Ct. 690, 695–96, 66 L.Ed.2d 621 (1981); *United States v. Vasquez,* 2d Cir., 634 F.2d 41, 43 (1980). In *Cortez,* the United States Supreme Court cautioned that terms like "articulable reasons" and "founded suspicion" are not self-defining. But the Court noted that any assessment of police conduct must be two-pronged, based upon: (1) "all the circumstances," including objective observations and "consideration of the modes or patterns of operation of certain kinds of lawbreakers"; and (2) the inferences and deductions that a trained officer could make which "might well elude an untrained person." *Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 695. We believe that standard is an appropriate one for use by courts reviewing the conduct of detaining officers, and we adopt it here.

In our case, the officers relied upon specific factors together with a "drug courier profile" to justify their articulable suspicion. Although the use of "profiling" is vigorously debated in academic circles, it has been accepted by the United States Supreme Court. The Court has stated that a "profile," alone, will not justify a seizure, but when considered in conjunction with police observations, a seizure could be warranted even though the "non-profile" observations by themselves would not justify an investigatory stop. *Sokolow,* 490 U.S. at 9, 109 S.Ct. at 1586–87. Moreover, the fact that the articulated factors "may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent." *Id.* at 10, 109 S.Ct. at 1587.

Here the "profile" characteristics were: (1) the defendants came into Wilmington via bus from New York (a known drug source city); (2) they carried no luggage; (3) they came in at night, typically when law enforcement activity is at a minimum; and (4) they traveled as a pair. This profile was compiled relying upon police experience, based on past arrests of individuals bringing drugs into the City of Wilmington. The "non-profile" factors relied upon by police were: (1) the defendants' startled reaction to uniformed police officers upon exiting the bus (ceasing their conversation); (2) quickly leaving the bus terminal in a direction away from the officers; (3) the defendants' repeated glances over their shoulders to see if the officers were following them both before and after turning the corner; (4) rapid stride; and (5) abrupt about face upon seeing a marked police car.

When assessing the relevance of these factors the focus is not on whether the "particular conduct is 'innocent' or 'guilty' but the degree of suspicion that attaches to particular types of conduct." *Illinois v. Gates,* 462 U.S. 213, 245 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). Courts have recognized that wholly lawful and innocent conduct descriptive of a large segment of the population can justify the suspicion that criminal activity is afoot. *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).

When Quarles exited the New York bus in Wilmington, he and his companion satisfied a number of well known "drug courier profile" characteristics. While this fact alone would not justify a seizure, when combined with the other specific instances of suspicious and odd behavior, police were justified in effectuating a seizure. *Com. v. Mallory,* 418 Pa.Super. 614, 614 A.2d 1174, 1178 (1992). This Court notes that the conclusions reached by the officers as to Quarles' behavior were based in large part upon their personal experiences in conducting drug courier surveillance at the bus station.[3] Combined, the officers con-

---

**2.** The Court described the formulation of suspicion as follows:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; ju-

rors as fact finders are permitted to do the same—and so are law enforcement officers. *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

**3.** The record contains relevant testimony concerning the officers' observations and the abnormal behavior of Quarles.

ducted surveillance at the bus station over 90 times, approximately two to three times a month, with, over the past year, Officer Looney personally arresting 12 people for carrying drugs through the station.[4]

The two arresting officers, drawing on their experience of observing hundreds of people move through the bus station, were able to conclude that Quarles' behavior was abnormal and suspicious when compared to other passengers.[5] Quarles' suspicious behavior and the "drug profile," when taken as a whole from the perspective of one who is trained in narcotics detection, produces a reasonable articulable suspicion that a crime was afoot. We therefore conclude that the police officers had a sufficient basis upon which to support an initial stop to question Quarles.

The safeguarding of a citizen's rights against unreasonable stops and seizures by police officers is a cherished protection under the Fourth Amendment and this Court's obligation to advance those rights is clear. But this Court should not turn a blind eye to the realities of society's war against drugs and the experience of the police in combating that problem. We are entitled to test the actions of the police by the exacting standards of the Fourth Amendment jurisprudence, but we should be reluctant to substitute an academic analysis for the on the spot judgment of trained law enforcement officers. There is no suggestion here of a pretextual stop—merely a disagreement concerning the level of suspicion.

 Finally we turn to the remaining issue in this appeal—whether Quarles voluntarily consented to having the police search his person for illegal weapons or drugs. According to Quarles' own testimony, the officers stated that they were having problems with weapons coming in from New York and asked if Quarles would consent to a search. It is at this point that Quarles' version of the events differs from that of the officers. Quarles contends that he only consented to a search of his bag while the officers testified that Quarles consented to a search of his person as well as his bag. As to the scope of

---

The following is from the redirect examination of Officer Looney:

Q. In the forty times you had been there, had you been able to tell the difference between people who are just looking around and people who are looking around suspiciously, at least in your mind.
A. Yes.
Q. When the fifteen to twenty people that got off the bus before these two got off the bus, did they all look at you or notice you?
A. I'm sure they did, yes.
Q. Did they do the same kinds of things that these two did with regard to noticing your presence?
A. No.

\* \* \* \* \*

Q. Did any of the other fifteen or twenty people keep looking back to see where you were?
A. No.
Q. What about you said there were some people waiting to get on the bus.
A. Yes.
Q. Did you notice any of them looking at you?
A. No. Most of the time they just look at us once and that's it. They're happy to see that we're down there, I suppose.

4. The officers' extensive experience conducting surveillance at the bus station is supported by testimony elicited during the trial.
The following is from the cross examination of Officer Looney:

Q. Prior to September 5th, 1995 how many times had you done surveillance at either the bus station or the Amtrak train station?
A. To date not including this—
Q. I'm talking about prior to September 5th, 1995, not after.
A. I'd say close to a dozen cases.
Q. You had been down there a dozen times?
A. No. I mean we've been down there more than that. I'd say we've been down there at least thirty, forty times.
Q. What period of time would that cover?
A. From, I would say, within about a year.
Q. So you go down there maybe once or twice a month, three times a month?
A. About that. It depends.

The following is from the direct examination of Officer Cunningham:

Q. [H]ow many times have you been down there [at the bus station] conducting surveillance just generally? More than fifty?
A. Probably.

5. With over 90 surveillance operations at the bus station, if each night only one bus carrying twenty passengers came into the station, the two arresting officers would have witnessed the behavior of over 1800 passengers. This vast experience gave the officers an adequate frame of reference for detecting abnormal or suspicious behavior.

the consent, the Superior Court was faced with an issue of credibility.

In determining that Quarles did in fact consent to a search of his person, the Superior Court concluded that the testimony of Officers Looney and Solge was more credible than that of Quarles. As this Court has stated previously in passing upon a trial court's factual findings made incident to a suppression hearing, it is the province of the trier of fact to judge the credibility of the witnesses and to resolve conflicts in testimony. *Chao v. State*, Del.Supr., 604 A.2d 1351, 1363 (1992). The Superior Court's decision not to accept the testimony of Quarles will not be disturbed by this Court on appeal.

After careful review of the record, we conclude that Quarles' detention was permissible under the Fourth Amendment and that he voluntarily consented to the search of his person. Accordingly we affirm the decision of the Superior Court.

VEASEY, Chief Justice, dissenting: [6]

The crux of this case is whether the stop and seizure of Quarles passes constitutional muster. I submit, respectfully, that the majority opinion rests on a novel rationale— unprecedented deference to subjective police observations based solely upon law enforcement experience.[7]

The majority correctly states that, under *Reid v. Georgia* and other applicable United States Supreme Court decisions, "any cur-

tailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." [8] The key words here are "reasonable" and "articulable." These are objective tests. " 'Reasonable suspicion' has been defined as the officer's ability 'to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.' " [9] Hunches and subjective impressions of experienced police officers will not suffice:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.' " The Fourth Amendment requires "some minimal level of objective justification" for making the stop.[10]

A court must scrutinize the objective evidence relating to the police conduct and weigh "the totality of the circumstances—the whole picture"—to determine if the "detaining officers ... have a *particularized and objective* basis for suspecting the particular person stopped of criminal activity." [11] In my view, the officers' belief in this case that Quarles and Thomas were attempting to conceal contraband "was more an 'inchoate and unparticularized suspicion or "hunch" ' than a fair inference in the light of [the officers'] experience." [12] Accordingly, I respectfully dissent.

The independent judiciary must approach the constitutional analysis from the perspec-

---

**6.** I agree with the majority and the Superior Court that the police conduct did constitute a seizure in that such conduct communicated to a reasonable person that the person was not free to terminate the encounter with the officers. I also agree with the majority that, assuming *arguendo* that the seizure was valid, the Superior Court's finding was not clearly erroneous that the scope of the voluntary consent included the search of Quarles' bag as well as his person. The only issue on which I dissent is the crucial issue of the constitutional validity of the seizure.

**7.** The relevant portions of the record are set forth in the Appendix to this dissent.

**8.** *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980); *see also United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637,

2641–42, 77 L.Ed.2d 110 (1983); *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968).

**9.** *Coleman v. State*, Del.Supr., 562 A.2d 1171, 1174 (1989) (quoting *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880).

**10.** *United States v. Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (citations omitted).

**11.** *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981) (emphasis supplied).

**12.** *Reid v. Georgia*, 448 U.S. at 441, 100 S.Ct. at 2754 (quoting *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883).

tive of protecting innocent citizens from unwarranted police intrusion. The fact that it was ultimately found, after an unconstitutional search, that Quarles was a drug courier does not change that analysis. As early as 1896, the United States Supreme Court recognized many reasons why an innocent person might avoid law enforcement personnel, including fear of being wrongly apprehended or a desire not to be put through the annoyance and expense of detainment.[13] Moreover, to assume that innocent persons have no reason to fear sudden approach by police ignores the experiences of many members of minority groups.[14] "[T]he protection from unreasonable searches is not diminished by the desire, no matter how laudable, to aid law enforcement."[15]

It is as reasonable to assume that Quarles walked away from the police "simply to avoid the annoyance and trouble of needlessly having to explain himself to a curious policemen, as it is to conclude that defendant is a drug courier in possession of drugs."[16] Quarles walked briskly on well-lit, public sidewalks. He did not run. He did not duck into an alley or in any way attempt to hide from police. In fact, he was always within the view of police. Just as detainees are free to walk away from consensual encounters,[17] they are similarly free to rebuff attempts by law enforcement personnel to approach them.[18] "The adverse inference that an officer draws about the way a person communicates his desire not to speak to an officer is nothing more than a hunch which, under *Terry*, cannot become the sole basis for detaining a person."[19]

Other courts have reached the conclusion that the seizure was unconstitutional in cases involving facts similar to this case.[20] While

**13.** *Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896).

**14.** *See generally* Sheri Lynn Johnson, *Race and the Decision to Detain a Suspect*, 93 Yale L.J. 214 (1983). *See also California v. Hodari D.*, 499 U.S. 621, 630 n. 4, 111 S.Ct. 1547, 1553 n. 4, 113 L.Ed.2d 690 (1991) (Stevens, J., dissenting).

**15.** *State v. Webber*, N.H.Supr., 694 A.2d 970, 972 (1997). In *Webber*, the New Hampshire Supreme Court invalidated a warrantless search conducted by police arising from a "frisk" of the detainee's wallet following a speeding stop. The decision is based on state constitutional grounds. The relevant New Hampshire constitutional provision is substantially identical to Article I, Section 6, of the Delaware Constitution and the Fourth Amendment to the United States Constitution. *See Delaware v. Prouse*, 440 U.S. at 651–53, 99 S.Ct. at 1394–96. In the case before us, the majority opinion is expressly based on the United States Constitution.

**16.** *United States v. Duffy*, D.Minn., 796 F.Supp. 1252, 1259 (1992).

**17.** *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) ("[During a valid investigatory stop,] the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion. But the detainee is not obliged to respond.")

**18.** *See Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) ("refusal to cooperate [with police], without more, does not furnish minimum level of objective justification needed for detention or seizure"); *Flori-*

*da v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (refusal to listen to or answer police officer during consensual encounter does not furnish objective justification for detaining person); *United States v. Wilson*, 4th Cir., 953 F.2d 116, 126 (1991) (consensual encounter became an unjustified seizure when police continued to badger a traveler with questions as he attempted to walk away after refusing the officer's request to search his coat).

**19.** *United States v. Duffy*, 796 F.Supp. at 1260 n. 8.

**20.** *Brown v. Texas*, 443 U.S. at 52, 99 S.Ct. at 2641 (two men in alley considered to have high incidence of drug traffic walked away from each other upon sighting marked police car); *United States v. Green*, 8th Cir., 52 F.3d 194 (1995) (woman, traveling alone and wearing baggy clothing and sunglasses, deplaned from a drug source city, walked hurriedly and purposefully, and looked behind her); *United States v. Lambert*, 10th Cir., 46 F.3d 1064 (1995) (nervous man traveling alone exited airport quickly after retrieving one checked bag and had one-way ticket purchased with cash from drug source city); *United States v. O'Neal*, 8th Cir., 17 F.3d 239 (1994) (defendant and his brother exited bus from drug source city, walked briskly toward parking lot rather than to the bus terminal, stared at one of the officers, and lit cigarettes); *United States v. Wilson*, 953 F.2d at 126 (defendant exited shuttle from New York, had bulge in coat pocket, and glanced back a few times); *United States v. Millan*, 8th Cir., 912 F.2d 1014 (1990) (defendant arrived by plane from drug source city, walked quickly through the airport, was vague about purpose of his trip, and had

the defendant's behavior in the instant case gave rise to some suspicion, "some" suspicion does not equate with "reasonable suspicion."[21] On "some" suspicion, the officers could have continued to follow Quarles and Thomas or they could have asked to speak with the travelers, without implicating Fourth Amendment rights.[22] But they could not have carried out the seizure and subsequent search as they did here.

Other cases finding reasonable suspicion usually contain additional suspicious factors that are absent from this case. In this case police did not rely on intelligence reports that drugs were being carried on the bus or that defendant, or anyone fitting his description, was transporting drugs to Wilmington.[23] There were no suspicious indications of contraband hidden in the defendants' clothing, such as a bulge.[24] There were no false statements blurted out without reason.[25] There were no suspicious hand signals or papers passed secretly.[26]

The majority opinion rests on the conclusion that the seizure was constitutionally valid because it was supported by "inferences and deductions that a trained officer could make which 'might well elude an untrained person' " and " 'consideration of the modes or patterns of operation of certain kinds of lawbreakers.' "[27] For this proposition, the majority relies on *Cortez,* but I respectfully submit that *Cortez* does not support the majority's holding.

The majority would have Delaware adopt a two-pronged standard "for use by courts reviewing the conduct of detaining officers."[28] Instead, the majority has created a new standard not supported by *Cortez* or other authority I have been able to find. The majority splits in two the first prong articulated in *Cortez*[29] and ignores the critical second element:

> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio,* said that, "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*"[30]

purchased one-way ticket with cash); *United States v. White,* 8th Cir., 890 F.2d 1413 (1989) (man, traveling alone, clutched small carry-on bag, stopped and looked around approximately three times while en route to baggage-claim, and waited anxiously for luggage); *United States v. Gooding,* 4th Cir., 695 F.2d 78 (1982) (man deplaned, scanned concourse, acknowledged drug agents' presence in alleged cat-and-mouse game of mutual surveillance, made three phone calls); *United States v. Buenaventura–Ariza,* 2d Cir., 615 F.2d 29, 36 (1980) (court found no "objective facts which, when viewed in conjunction with nervous behavior and arrival from a source city, raise the complex of conduct to a level justifying reasonable suspicion of criminal activity.").

**21.** *United States v. Wilson,* 953 F.2d at 127. *See also United States v. Buenaventura–Ariza,* 615 F.2d at 36, quoting *United States v. Price,* 2d Cir., 599 F.2d 494, 500 n. 7 (1979) ("awareness of the unusual ... is not the same as an articulated suspicion of criminal conduct.").

**22.** *Florida v. Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24.

**23.** *See United States v. Weaver,* 8th Cir., 966 F.2d 391, 394 n. 2 (1992); *United States v. Condelee,* 8th Cir., 915 F.2d 1206, 1208 (1990); *United*

*States v. Canales,* 6th Cir., 572 F.2d 1182, 1183 (1978).

**24.** *United States v. Wilson,* 953 F.2d at 119; *United States v. Harrison,* 4th Cir., 667 F.2d 1158, 1160 (1982).

**25.** *See United States v. Glover,* 2d Cir., 957 F.2d 1004, 1007 (1992); *United States v. Sterling,* 7th Cir., 909 F.2d 1078, 1084 (1990); *United States v. Harrison,* 667 F.2d at 1160.

**26.** *See United States v. Vasquez–Santiago,* 2d Cir., 602 F.2d 1069, 1071 (1979); *cf. United States v. Magda,* 2d Cir., 547 F.2d 756, 757 (1976).

**27.** Majority Opinion at 1338 (quoting *United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. at 695).

**28.** Majority Opinion at 1338.

**29.** *See United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

**30.** *United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. at 695 (citations omitted, emphasis in original).

As demonstrated herein, the data available to Officers Cunningham, Looney, and Solge at the time they seized Quarles completely lacked specificity and could not have raised a justifiable suspicion that Quarles was engaged in wrongdoing. Unfortunately, it is the majority's Opinion, not the record, that undertakes to rescue the seizure here.

In *Cortez,* on the other hand, the immigration officers built a compelling case that the defendant was bringing illegal aliens across the border. Chief Justice Burger commented:

> We see here the kind of police work often suggested by judges and scholars as examples of appropriate and reasonable means of law enforcement. Here, fact on fact and clue on clue afforded a basis for the deductions and inferences that brought the officers to focus on [the defendant].[31]

This objective and compelling evidence is then painstakingly marshaled in the opinion.[32] No such showing is present in this skimpy record. Here there was no attempt by the State to present the officers' observations as expert or as demonstrating the kind of pattern testimony remotely akin to the mountain of evidenced amassed in *Cortez.*

The Superior Court found that the police had reasonable suspicion to detain Quarles based on "the apparent startled reaction to uniformed police officers on the part of Defendants upon exiting [the bus], their repeated glances back at the officers coupled with the rapid stride of Defendant, and their abrupt about face upon seeing a marked police car[.]"[33] The majority opinion embel-

lishes this finding by stating that "the officers relied upon specific factors together with a 'drug courier profile' to justify their articulable suspicion."[34] This profile theory, which is notably absent from the trial judge's findings, is stated by the majority as follows:

> Here the "profile" characteristics were: (1) the defendants came into Wilmington via bus from New York (a known drug source city); (2) they carried no luggage; (3) they came in at night, typically when law enforcement activity is at a minimum; and (4) they traveled as a pair. This profile was compiled based upon police experience, based on past arrests of individuals bringing drugs into the City of Wilmington.[35]

The majority states that the United States Supreme Court has accepted the use of drug profiles. But, respectfully, I read the case law differently. In *Sokolow,* the Court did not affirmatively validate the profile as an independent justification. It merely suggested that the use of the profile notion did not *detract* from the evidence:

> A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent.[36]

Moreover, I question whether the four benign facts cited by the majority establish a

---

**31.** *United States v. Cortez,* 449 U.S. at 419, 101 S.Ct. at 696.

**32.** *United States v. Cortez,* 449 U.S. at 419–21, 101 S.Ct. at 695–97 (officers knew, *inter alia,* that area was a crossing point for illegal aliens, that someone with chevron-soled shoes had led several groups of aliens by the same path across the border in the previous two months, that the next expedition would probably take place on a clear night, that "Chevron" (the defendant) would likely arrive at a deserted point (milepoint 122) on a deserted road (Highway 86) between 2 and 6 a.m. with a group of 8 to 20 aliens, that on the night in question a large enclosed vehicle was seen to make a round trip to and from milepost 122 on Highway 86).

**33.** *State v. Quarles,* Del.Super., Cr. A. No. IN95–09–0677 through 0679 and IN95–09–1189, slip op. at 6, 1996 WL 30246 (Jan. 16, 1996) (footnote omitted). The Superior Court found that "Defendant was walking so fast that Co–Defendant had to run to catch up with him." *State v. Quarles,* slip op. at 6 n. 2. At oral argument, both parties agreed that there was no basis in the record for the assertion that Thomas ran to catch up with Quarles.

**34.** Majority Opinion at 1338.

**35.** Majority Opinion at 1338.

**36.** *United States v. Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1587.

profile, even if the officers had so testified.[37] These four facts taken as a whole might well describe a number of innocent people. New York City is only 120 miles from Wilmington. Nighttime travel with a companion and without luggage is hardly remarkable. As for New York City being a "known drug source city," what city is not infested with drugs and drug suppliers? [38] Even the trial judge here concluded, "The mere fact that they exited a bus coming from New York City would not give rise to a reasonable suspicion." [39]

Following its discussion of "profile," the majority adds the following "non-profile" factors:

> The "non-profile" factors relied upon by police were: (1) the defendants' startled reaction to uniformed police officers upon exiting the bus (ceasing their conversation); (2) quickly leaving the bus terminal in a direction away from the officers; (3) the defendants' repeated glances over their shoulders to see if the officers were following them both before and after turning the corner; (4) rapid stride; and (5) abrupt about face upon seeing a marked police car.[40]

The majority cites *Reid v. Georgia* for the proposition that "wholly lawful and innocent conduct descriptive of a large segment of the population can justify the suspicion that criminal conduct is afoot." [41] Yet, the major-

ity opinion's citation of this proposition from *Reid* must be considered in the context of the entire quote from that portion of the decision, one which held the seizure to be unconstitutional on facts similar to those presented here:

> Specifically, the court [below] thought it relevant that (1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags.
>
> We conclude that the agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. Nor can we agree,

---

**37.** In fact, Officer Looney's testimony indicates that he did not attach any negative inference to these facts.

> Q. On this particular occasion on September 5th, 1995, did you have any tips or intelligence that someone was coming in that particular day at that particular time who might be transporting drugs?
> A. No, we didn't.
> Q. You're just down there on a hunch?
> A. We were down there because the train was coming in at 9:36.
> Q. You didn't have any information or intelligence about any particular drug activity that particular day?
> A. No.
> Q. Now, when you saw Mr. Quarles and the other gentleman get off the bus, you mentioned the fact that they got off the bus last. Did that arouse your suspicion?
> A. No.
> Q. Did the fact that they were black arouse your suspicion?
> A. No.

> Q. Did the fact that they were carrying these black plastic bags that you described arouse your suspicion?
> A. No.

**38.** As Justice Marshall wrote in his dissent in *United States v. Sokolow:*

> That Sokolow embarked from Miami, "a source city for illicit drugs," ... is no more suggestive of illegality; thousands of innocent persons travel from "source cities" every day and, judging from the DEA's testimony in past cases, *nearly every major city in the country may be characterized as a source or distribution city.*

*United States v. Sokolow,* 490 U.S. at 16, 109 S.Ct. at 1590 (Marshall, J., dissenting) (emphasis added, citation omitted).

**39.** *State v. Quarles,* slip op. at 6.

**40.** Majority Opinion at 1338.

**41.** Majority Opinion at 1338.

on this record, that the manner in which the petitioner and his companion walked through the airport reasonably could have led the agent to suspect them of wrongdoing. Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, see *Terry v. Ohio, supra,* 392 U.S., at 27–28, 88 S.Ct., at 1883, this is not such a case. The agent's belief that the petitioner and his companion were attempting to conceal the fact that they were traveling together, a belief that was more an "inchoate and unparticularized suspicion or hunch,'" 392 U.S., at 27, 88 S.Ct., at 1883, than a fair inference in the light of his experience, is simply too slender a reed to support the seizure in this case.[42]

At bottom, the majority opinion attaches a novel, and outcome-determinative, deference to experienced police eyes without any expert or empirical evidence.[43] This precedent would erode the objective standard by which reasonable articulable suspicion is to be measured. The majority attempts to justify this novel approach to Fourth Amendment law by declaring that "the United States Supreme Court has stated that the circumstances must be evaluated under an objective/subjective standard."[44] With due respect to my colleagues, I question whether the United States Supreme Court has departed from the objective test that there must be a reasonable and articulable suspicion of criminal activity. Indeed *Cortez,* upon which the majority relies, requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity.[45]" If the precedent embodied in the majority opinion is taken to its logical extreme, police experience alone, and without articulable expert analysis or meticulous police work of the kind found in *Cortez,* will almost always support the seizure.

Drug traffic into our cities is a cancer that must be dealt with firmly and effectively. Police officers deserve the maximum resources that can be provided by the executive and legislative branches of government. And their operations should not be judged by an "academic analysis" leading to a naive expectation that "turns a blind eye to the realities of society's war against drugs and the experience of police officers in combating that problem."[46] But that is not this case. As in *Reid v. Georgia,* the officers' observations here were "simply too slender a reed to

---

**42.** *Reid v. Georgia,* 448 U.S. at 440–41, 100 S.Ct. at 2753–54. Moreover, *Sokolow,* on which the majority relies, involved dramatically different facts from those presented here. There, the agents knew defendant made a 48–hour turn-around on a round trip from Honolulu to Miami, which takes 20 hours, he traveled under an alias, paid $2,100 in cash for the plane ticket, appeared nervous, checked no luggage, etc. *United States v. Sokolow,* 490 U.S. at 3, 109 S.Ct. at 1583. *See* excerpts from Officer Looney's testimony concerning the movements of Quarles and Thomas as follows:

Q. So you don't really know whether he was walking at a fast pace for him or not, do you?
A. No.
Q. In your experience, … [i]s it unusual for a person in that situation perhaps to be a little disoriented about what direction they might be going in or where they might be going?
　　　　* * *
A. Everybody looks around when they get off the bus or the train.
Q. So that's not unusual, is it?
A. Not really, no.

**43.** I question the validity of the majority's reliance on the arresting officers' experience in conducting surveillance at the Wilmington bus terminal. Majority Opinion at 1339 n. 5. The majority appears to equate arrests with guilt and omits any statistics regarding the number of innocent people who have been stopped (or not stopped) by the officers or any members of the Wilmington police department. The majority's rationale rests precariously and solely on the location. It would support *ipse dixit* a stop at almost any city's airport, train terminal or bus station, notwithstanding that it is predominately innocent travelers who use these facilities. Would the majority come to a different conclusion if the location had been a park, a zoo or a suburban shopping center? It is to be remembered that cases like *Reid v. Georgia* involved a public airport where drug couriers ply their trade, but the location did not rescue the unconstitutional searches and seizures in those cases.

**44.** Majority Opinion at 1337.

**45.** *United States v. Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 694–95.

**46.** Majority Opinion at 1339.

support the seizure in this case." [47]

This case is about constitutional protections that the judicial branch of government is obliged to enforce for the protection of innocent citizens, as well as reprehensible drug traffickers who poison our citizens. With the utmost deference, I must state my concern that the rationale and the unprecedented reach of the majority opinion is dangerous and could lead to a pernicious erosion of our liberty.

## APPENDIX

### Hearing on Motion to Suppress, January 16, 1996

**Excerpts from Direct Examination of Officer Looney:**

Q. Officer Looney, ... on September 5th of 1995 ... 10:00 at night. Were you in uniform?

A. Yes, I was.

Q. Did you have occasion to meet the bus from New York on that particular date?

A. Yes, I did.

Q. What did you do?

A. Myself and Officer Solge were on the northwest corner of Martin Luther King and French Street conducting surveillance for illegal drug couriers.... [T]he Peter Pan bus runs at certain times, and we just go down there at the times.... [T]he Peter Pan bus arrives between ten and 10:15 at night.... [o]riginating from New York City.

 \* \* \* \* \* \*

Q. What did you observe?

A. We observed ... fifteen to twenty passengers [exit] the bus with the defendant and co-defendant exiting the bus last.

Q. What did they do when they got off the bus?

A. They were holding a conversation when they were exiting the bus. Once they hit the sidewalk area from the bus, defendant Quarles looked in a

southerly direction and observed myself and Officer Solge standing on the corner. Their conversation came to an abrupt halt.

 \* \* \* \* \* \*

Q. After the conversation came to an abrupt halt, what happened?

A. They were motionless for approximately, I'd say, maybe five to ten seconds as if they were trying to figure out which direction they were going to go in.... At that time, they went north, in a northerly direction up French Street towards 2nd.

Q. Were they still together?

A. Yes. Well, defendant Quarles started walking at a fast pace first and the co-defendant finally caught up with him halfway in the block.... While they were walking north on French Street towards 2nd, at three different times defendant Quarles was observed looking over his shoulder to find out what the location of myself and Officer Solge was as they walked up the bus lot.... When they hit the corner of 2nd and French they walked in a westerly direction on 2nd Street. Officer Cunningham was in the parking lot across the street in his marked patrol vehicle. He made eye contact with them, at which time they turned and started walking eastbound on 2nd back towards French with defendant Quarles looking down in a southerly direction to find out where myself and Officer Solge were.

Q. They went down to the end of the block and Cunningham was there in a marked car?

A. Yes.

Q. Then they came back the same way they had come?

A. Correct.

Q. Where were you when they were coming back?

A. We were almost to the intersection of 2nd and French.

Q. Were you within view of them?

---

**47.** *Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754.

A. Yes.

Q. As they came back, what did they do?

A. They were still looking around to try and find out which way they were going to go. I guess you could say they were kind of surprised that we were on our way up the street, and there was a police car in the parking lot across the street.... At that time, I approached them and asked if I could speak to them. They stopped walking, said that we could talk to them, and the conversation ensued.

\* \* \* \* \* \*

**Excerpts from Cross Examination of Officer Looney:**

Q. Prior to September 5th, 1995 how many times had you done surveillance at either the bus station or the Amtrak train station?

A. To date not including this—

Q. I'm talking about prior to September 5th, 1995, not after.

A. I'd say close to a dozen cases.

Q. You had been down there a dozen times?

A. No. I mean we've been down there more than that. I'd say we've been down there at least thirty, forty times.

Q. What period of time would that cover?

A. From, I would say, within about a year.

Q. So you go down there maybe once or twice a month, three times a month?

A. About that. It depends.

Q. On this particular occasion on September 5th, 1995, did you have any tips or intelligence that someone was coming in that particular day at that particular time who might be transporting drugs?

A. No, we didn't.

Q. You're just down there on a hunch?

A. We were down there because the train was coming in at 9:36.

Q. You didn't have any information or intelligence about any particular drug activity that particular day?

A. No.

Q. Now, when you saw Mr. Quarles and the other gentleman get off the bus, you mentioned the fact that they got off the bus last. Did that arouse your suspicion?

A. No.

Q. Did the fact that they were black arouse your suspicion?

A. No.

Q. Did the fact that they were carrying these black plastic bags that you described arouse your suspicion?

A. No.

Q. The fact that they were talking with each other after they got off the bus, was that suspicious?

A. No.

Q. Did the fact that they ... made eye contract with you ... they stopped talking?

\* \* \* \* \* \*

A. ... the conversation abruptly stopped.

Q. Did that arouse your suspicion?

A. Yes, it did.

Q. If they had continued talking, would you have been suspicious?

A. Probably not.

\* \* \* \* \* \*

Q. And after the one individual saw you, the conversation didn't pick up again?

A. No.

Q. At that point these two individuals started walking, I think you said, northbound on French Street?

A. On French Street with your client walking at a quicker pace than the other one.

\* \* \* \* \* \*

Q. Do you know how fast he walks or how slow he normally walks?

A. No.

Q. So you don't really know whether he was walking at a fast pace for him or not, do you?

A. No.

Q. In your experience, ... [i]s it unusual for a person in that situation perhaps

to be a little disoriented about what direction they might be going in or where they might be going?

\* \* \* \* \* \*

A. Everybody looks around when they get off the bus or the train.

Q. So that's not unusual, is it?

A. Not really, no.

\* \* \* \* \* \*

Q. When you were walking up French Street following Mr. Quarles, were there any people in between you?

A. Yes.

\* \* \* \* \* \*

Q. Were some of them looking at you?

A. Yeah.

**Excerpts from Redirect Examination of Officer Looney:**

Q. In the forty times you had been there, had you been able to tell the difference between people who are just looking around and people who are looking around suspiciously, at least in your mind.

A. Yes.

Q. When the fifteen to twenty people that got off the bus before these two got off the bus, did they all look at you or notice you?

A. I'm sure they did, yes.

Q. Did they do the same kinds of things that these two did with regard to noticing your presence?

A. No.

\* \* \* \* \* \*

Q. Did any of the other fifteen or twenty people keep looking back to see where you were?

A. No.

Q. What about you said there were some people waiting to get on the bus.

A. Yes.

Q. Did you notice any of them looking at you?

A. No. Most of the time they just look at us once and that's it. They're happy to see that we're down there. I suppose.

**Excerpt from Direct Examination of Officer Cunningham:**

Q. [H]ow many times have you been down there [at the bus station] conducting surveillance just generally? More than fifty?

A. Probably.