IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,           )
                             )
        V.                   )        I.D.: 1710007866
                             )
ANDRE MURRAY,                )
                             )
              Defendant.     )


Decided: April 2, 2018
Submitted: March 29, 2018


**MEMORANDUM OPINION**

*Upon Consideration of Defendant's Motion to Suppress.*
**GRANTED**.


Erika R. Flaschner, Esquire, DEPARTMENT OF JUSTICE, Wilmington, Delaware. Attorney for the State.

Ross A. Flockerzie, Esquire, OFFICE OF DEFENSE SERVICES, Wilmington, Delaware. Attorney for the Defendant.


**BUTLER, J.**

This is a pedestrian stop resulting in the seizure of a handgun. The defendant has moved to suppress the handgun. The Court will grant the motion with the following findings and observations.

## FACTS

In the late evening hours of October 13, 2017, four members of the Wilmington Safe Streets squad were on "proactive patrol" in a single unmarked vehicle. They were northbound on South Franklin Street and stopped at a stop sign at the corner of South Franklin and Chestnut Street—a neighborhood described by the officer as a "high crime" neighborhood.

While so stopped at said stop sign, Officer Rosaio, who was the driver and sole witness for the State, saw two men walking towards them, southbound on the sidewalk of South Franklin Street, headed toward the intersection with Chestnut Street. Officer Rosaio told the Court that one of the two men was swinging his left arm naturally but holding his right arm close to his body which behavior, the officer testified from his "training and experience," was consistent with an armed gunman. We will have more to say about this momentarily. But there is very little left to the story so let us finish first.

As the two continued toward them, Officer Rosaio suspected the "one arm swinging man" was armed. Officer Rosaio waited, watching— for "6 to 7 seconds." He testified that as they got closer, the defendant appeared to notice them and he

2

took a "stutter step" as he was reaching the curb. He then slowed his gate. Officer Rosaio opened the driver's side door and the defendant appeared to move behind his walking partner, but made no sudden move and was still plainly visible to Officer Rosaio, who was only about five feet away. The defendant did, however, turn his body somewhat, a behavior Officer Rosaio characterized as "blading," a move he testified, from his training and experience, was another characteristic of an armed gunman.

Convinced the defendant was armed, Officer Rosaio drew his revolver and told the defendant not to move his hands towards his waist. Exactly how it all went from there is unclear, but we know that the defendant was taken to the ground and when he was rolled over, a firearm was indeed recovered from his right side.

## ANALYSIS

### A.    Facts vs. Hunches

To be sure, there was perhaps a moment, as the officer was exiting his vehicle and before he drew his service revolver, where this was a "*Terry*" stop, requiring reasonable articulable suspicion that criminal activity is afoot and the subject is armed and dangerous.[1] But upon seeing the defendant turn his body, and before any "real" contact was made, the officer candidly testified that he was convinced the

---

[1] *Terry v. Ohio,* 392 U.S. 1, 30 (1968).

defendant was indeed armed and may be reaching for his pistol and thus, an arrest was effectuated which, as we all know, must be preceded by probable cause to believe a crime is being committed and the suspect committed it.

Alas, neither side parsed its arguments so neatly into "reasonable articulable suspicion" or "probable cause." The defense takes the position that the officer had neither, at any time, while the State argues that deference is owed to the skills and training of the officer who determined the existence of either or both.

From the record, there is no "tell-tale bulge," no "furtive movement," no flight or abandonment, no informant tip, corroborated or otherwise, no "hand-to-hand" gestures. The State argues that none of this is needed because of the officer's training in "armed gunman" profiling. Indeed, he now trains others in this "science." Based upon his training and his experience—which while we assume is real but for which there is no further record—we are essentially told to "trust me."

There are many articulations of the standards the State must meet in sustaining its burden of proving the lawfulness of a stop. Justice Ridgely engaged the subject at some length in *Lopez-Vazquez v. State*. While the Court will dispense with a longer quote, it is worth reading. Most significantly, he said, "we think it impossible

4

for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."[2]

This is not an isolated refrain. *Terry* itself said, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."[3]

Thus, it cannot be, as the State urges, that the Courts are required to simply "trust" the training and experience of a police officer to make findings as to the appropriate balance between individual liberties and legitimate law enforcement. The logical ends of the State's argument would effectively vitiate judicial oversight of law enforcement's behavior towards citizens. Any officer could justify any stop, interrogation or detention on grounds that his "training and experience" led him to reasonably believe the subject is engaging in criminal conduct, leaving the judiciary with little to do but trust the officer's training and experience and sanction the intrusion. Thankfully, that is not the law. Subjective impressions or hunches are

---

[2] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1288 (Del. 2008) (citing *Karnes v. Skrutski*, 62 F.3d 485, 496 (3d Cir. 1995), *distinguished on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007)).

[3] *Terry,* 392 U.S. at 27.

insufficient.[4] The officer must be able to point to objective facts which, taken together with reasonable inferences, justify the government intrusion into the citizen's right to move about freely.

### B. The Armed Gunman Testimony

Here, the State relies almost exclusively on two objective facts: 1) the defendant's swinging of one arm while holding the other close to his side and 2) his "blading" or moving his body sideways when he and his walking partner stopped. The other factors include the high crime neighborhood, the apparent "stutter step" and his "looking around" as the officer was getting out of the car. These latter factors are, however, essentially chaff, thrown off by the essential facts that the officer advises his training and experience teach that the defendant was carrying a concealed weapon.

Does walking while swinging one arm and holding the other close to one's body appear suspicious? Probably not to the lay observer, but we are told that in the eyes of one trained to look for "armed gunmen," it is indeed indicative of just that.

---

[4] *Woody v. State,* 765 A.2d 1257, 1263 (Del. 2001) (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). *See also Quarles v. State,* 696 A.2d 1334, 1340 (Del. 1997) (Veasey, C.J. dissenting) (explaining that "[h]unches and subjective impressions of experienced police officers will not suffice" for reasonable suspicion).

What we are not told, however, is the basis for this belief. The record is bereft of any scientific support for the proposition. What percentage of armed gunmen walk swinging one arm but not the other? What percentage of citizens who walk swinging one arm but not the other are armed gunmen? How, if at all, do these percentages change based upon the time of day or the fact that it is a high crime neighborhood? Similarly, in a police encounter with a citizen, what percentage of the citizens turn their bodies away from the policeman? And of those that do, what percentage are hiding something? And of those that are hiding something, what percentage of them are hiding firearms?

The Court recognizes that the rules of evidence do not apply to "preliminary question[s] of fact governing admissibility",[5] but is nonetheless constrained to note that the "armed gunman" testimony in which we are asked to have faith is certainly not a "lay opinion" under D.R.E. 701 as it is professed to be based on "scientific, technical, or other specialized knowledge" and therefore, it is within the scope of D.R.E. 702. In order to qualify for admissibility under Rule 702, however, such testimony would necessarily be "based on sufficient facts or data" and "the product of reliable principles and methods" that have been "reliably applied" to the facts.[6]

---

[5] D.R.E. 1101(b)(1).
[6] D.R.E. 702.

7

None of these criteria have been met here. While the officer had some sort of "training," it cannot be said to have qualified as "science"—junk or otherwise. On this record, the Court cannot assign it the weight it was obviously accorded by the officer on the night in question.

## CONCLUSION

One supposes there is always a temptation to engage in *post hoc* reasoning that, since an officer's hunch turned out to be correct, we should accord it a wide path and backfill the logic leading to the capture of the weapon. We decline to do so in this case. The Court certainly understands the challenges facing police officers engaged in the "often competitive enterprise of ferreting out crime."[7] But we are bound to adhere to the greater value that under our Constitution, citizens are entitled to be free from government intrusion except when the government can articulate a clear, objective basis upon which to believe the intrusion is justified. The handgun seized as a result of the stop/arrest of the defendant will be suppressed.

**IT IS SO ORDERED.**

Judge Charles E. Butler

---

[7] *Johnson v. United States*, 333 U.S. 10, 14 (1948).

8